Chris Hudson sued Dolgencorp, Inc., d/b/a Dollar General Corporation ("Dollar General"), seeking workers' compensation benefits. Dollar General answered and denied liability. The trial court conducted an ore tenus hearing in June 2004.
The parties stipulated, among other things, that Hudson's on-the-job accident occurred on December 6, 2000; that Dollar General paid all of Hudson's authorized medical bills incurred as a result of the accident; that Hudson reached maximum medical improvement on August 21, 2003; and that Hudson's average weekly wage at the time of the accident was $450 with fringe benefits and $410.26 without fringe benefits. The parties also stipulated, and the trial court accepted, that the only issue before the trial court was the amount of Hudson's loss of earning capacity as a result of his on-the-job injury.
On September 21, 2004, the trial court entered a detailed final judgment in which it found Hudson to be permanently and totally disabled as a result of the on-the-job injury; the trial court awarded benefits accordingly. In its judgment, the trial court included the following pertinent facts:
 "At trial, [Hudson] testified that he was 33 years old, having a birth date of February 3, 1971. [Hudson] also testified that he had quit school in the 10th grade and had obtained his GED in 1994. Also, [Hudson] stated that he had attended Athena Computer Learning Center and Virginia College, where he took computer classes.
 "Regarding his work history, [Hudson] testified that he had worked as a picture framer, grocery store sacker, cashier, hydraulic mechanic, automotive parts runner, wrecker driver, parts puller, warehouse worker, and carpenter's assistant prior to going to work for [Dollar *Page 729 
General]. At the time of the on-the-job injury, [Hudson] testified that he was working as a store manager.
 "Further, [Hudson] testified that he was injured on December 6, 2000, while working for [Dollar General]. Specifically, he testified that he was carrying a case of chemicals when he tripped over a box and fell to the floor. [Hudson] testified that he felt immediate back pain, and he reported the accident to the assistant store manager, Ms. Barbara Williams. Later the same day, he telephoned his supervisor, District Manager Bill Dickinson, and reported his accident.
 "After the accident, [Hudson] testified that he was treated by Dr. Walter Wilson, Dr. Donald Slappey, Dr. Martin Jones, and Dr. Danny Michael. For injuries to his back, [Hudson] testified that he received the following treatments and tests:
"Epidural block injection
"Diskograms
"Physical Therapy
"Spinal fusion surgery 5/21/01, [and]
"Spinal refusion surgery 3/25/03.
 "After his first spinal fusion surgery, [Hudson] testified that he used a bone stimulator and that he currently uses a Micro Z brace with stimulator.
 "Upon reaching maximum medical improvement from his first surgery, Dr. Michael assigned a 12% permanent impairment rating. After [Hudson's] second surgery (refusion), he was given the same rating by Dr. Michael.
 "[Hudson] further testified that he is currently in chronic pain and is severely limited in his daily activities due to the effects of his pain medications. He also stated that his typical day includes watching television, spending some time on his home computer, driving and walking short distances and spending time with his son. At the time of trial, [Hudson] testified that he was being prescribed Morphine twice a day for pain and Flexeril for muscle spasms, and that said medications made him dizzy, lightheaded, drowsy, and affected his concentration and ability to focus. He also testified that he had problems sleeping due to his chronic pain.
 "Further, [Hudson] testified that he was fired by [Dollar General] for inventory loss and last worked on March 8, 2001. He also testified that he had not been previously warned by [Dollar General] before being fired. Since being fired, [Hudson] testified that he had worked one day as a salesman but could not continue due to his back pain, and that he attempted to find work but that he had not been successful. At the time of trial, [Hudson] testified that he was not able to work due to his chronic back pain and the effects of the medication (morphine) he was presently taking.
". . . .
 "[Hudson's] mother, Ms. Wanda Womack, testified at trial that [Hudson] currently resides with her at her residence. She further testified . . ., based upon her own personal observations, that [Hudson] is in chronic pain and that his daily activities are severely limited. She further testified that [Hudson] has trouble concentrating, staying on task, and sleeping due to his chronic pain and the effects of his medications.
". . . .
 "Orthopedic surgeon, Dr. Danny Michael, testified by deposition that he has been treating [Hudson] since February 28, 2001. On his first visit with Dr. Michael, [Hudson] gave him a history of falling backwards while carrying a 30 lb. box in his hands at work. Dr. Michael testified that [Hudson] underwent diagnostic *Page 730 
testing procedures, MRI's, and diskograms which indicated that he had an internal disk disruption and annular tearing of the disk at the L4-5 level in his back. Dr. Michael testified that he used a diagnostic tool, a diskogram, which is a procedure that allows the source of disk pain to be identified. On May 21, 2001, Dr. Michael performed fusion surgery on [Hudson] and, after such, had [Hudson] undertake physical therapy at Healthsouth Medical Center. In September or October of 2002, a CT scan showed that the first surgery had resulted in a nonunion of vertebrae in [Hudson's] back, and that was a symptomatic problem for [Hudson]. In January 2003, another diskogram was performed that also indicated a nonunion at the fusion site. Thereafter, [Hudson] underwent a second surgery to fuse the spine in March 2003. Post surgery, physical therapy was prescribed by Dr. Michael and [Hudson] was placed at maximum medical improvement as of August 20, 2003. During his course of treatment, [Hudson] was prescribed a bone stimulator to aid in the fusion of his vertebrae and a TENS unit to manage his pain.
 "After his second surgery, Dr. Michael prescribed narcotic pain and muscle relaxer medication for [Hudson]. Dr. Michael testified that [Hudson's] pain and muscle relaxer medication that he was taking (before being changed to morphine in 2004) could affect his ability to operate machinery or drive automobiles. Dr. Michael assigned [Hudson] a 12% impairment to his body after the first spinal fusion surgery and said such rating was the same after [Hudson's] second fusion surgery. Dr. Michael testified that [Hudson's] back condition was probably related to his on-the-job injury with [Dollar General]. After his two spine surgeries, [Hudson] underwent two functional capacity evaluations (FCE), which indicated that [Hudson] could return to medium or heavy classification work. However, Dr. Michael testified that FCEs have drawbacks as they show a function at a specific point in time and that patients have `good' and `bad' days which affect the results of such evaluations.
 "Occupational therapist, Ms. Deanna L. Hardigree, testified that she performed two FCEs on [Hudson], the first on March 12, 2002 and the second on August 11, 2003. In the first FCE, she placed [Hudson] in the medium category of work, which, according to the U.S. Department of Labor Standards, requires a worker to exert 20 lbs to 50 lbs of force occasionally and/or 10 lbs to 25 lbs of force frequently, and/or greater than 10 lbs of force constantly to move objects. After [Hudson's] second surgery, Ms. Hardigree performed the second FCE and placed [Hudson] in the heavy category of work which requires a worker to exert 50 lbs to 100 lbs of force occasionally, and/or 25 lbs to 50 lbs of force frequently, and/or 10 lbs to 20 lbs constantly to move objects, [according] to the U.S. Department of Labor Standards.
 "Ms. Hardigree stated that she had been working the last 17 years primarily with hand and upper extremity patients and that she had been performing FCEs since 1998. Regarding [Hudson's] FCE, Ms. Hardigree stated that Mr. Hudson was basically asked to perform the same tasks on both FCEs, and despite performing fewer circuits in the lifting category and not being able to perform a sustained bend in the second FCE, she placed [Hudson] in the more demanding category of work. Also, balancing and kneeling were not tested on either FCE, despite [Hudson] having undergone two *Page 731 
back surgeries. Ms. Hardigree testified that she did not know why balancing or kneeling were not tested. She further noted that [Hudson] could only bend for 30 seconds and, therefore, such activity was limited.
 "In the second FCE, it was also noted that during the walking part of the evaluation, [Hudson's] gait deteriorated to an uneven cadence in step and length, and Ms. Hardigree was unaware of such when she rated Mr. Hudson in the `frequent' level of walking ability. Also, Ms. Hardigree placed Mr. Hudson in the heavy classification in part based upon his lifting of 50 lbs on one occasion, even though this is the minimum amount of weight for such category.
 "Regarding Mr. Hudson's pain level, Ms. Hardigree testified that [Hudson] was never out of pain during the second evaluation; that his pain increased from a level 6 to a level 8 on a 10 scale; that he reported increased pain after walking for 30 minutes, and walking up stairs. Ms. Hardigree admitted that an FCE does not consider one's pain level when it determines what work classification the patient is placed in. Ms. Hardigree did testify that [Hudson] put forth a good effort on the second FCE.
 "Furthermore, Ms. Hardigree was asked if she thought Mr. Hudson could work as a roofer, climbing ladders, carrying 75 lb. bundles of shingles, and performing tasks that required bending, stooping, kneeling, crawling, and balancing, and she testified that she `doubted it,' even though she placed such job in the same category as she rated [Hudson]. Finally, Ms. Hardigree testified that she did not consider herself to be a vocational expert, and that she could not render an opinion regarding Mr. Hudson's ability to maintain gainful employment."
(Emphasis in original.)
The trial court further stated:
 "The Court observed [Hudson] during the course of this case, as well as his demeanor, and finds him to be credible. In addition, the Court observed [Hudson] in and around the courtroom as he walked, stood, and sat. It is the Court's finding that [Hudson] has apparent restrictions in his physical ability to move and walk. Such finding is supported by the medical evidence in this case.
 "Both of [Hudson's] vocational experts testified that they performed extensive vocational evaluations and that said evaluations consisted of interviewing [Hudson], reviewing his medical records, including the deposition of Dr. Daniel Michael, and administering vocational tests. Both Dr. Crumpton and Ms. Spruce [the vocational experts] opined that [Hudson] was 100% vocationally disabled due to his chronic pain condition which requires his taking morphine to tolerate. Both experts testified that employers are reluctant to hire individuals with significant back problems, and even more reluctant to hire individuals on narcotic pain medicine such as morphine. Based upon all the factors considered such as age, education, work history, medical history, vocational testing, physical abilities testing, and functional capacities evaluations, it was the opinion of both experts that Hudson had suffered a 100% loss of earning capacity. Finally, it was the opinion of both experts that the two functional capacity evaluations performed by occupational therapist Deanna L. Hardigree, which placed [Hudson] in the medium and heavy work classifications, were not reliable due to incomplete testing (crawling, kneeling, and balancing were not tested) *Page 732 
and differences of opinion regarding interpretation of the U.S. Department of Labor work level classification requirements. The Court finds the testimony of [Hudson's] vocational experts to be consistent and credible.
". . . .
 "[Dollar General's] vocational expert, Mr. Eddie Rice, testified that he performed a vocational evaluation of [Hudson] and that, in his opinion, [Hudson] had sustained a 21% vocational disability. However, at trial, vocational expert Rice testified that he was not aware that [Hudson] . . . utilized a Micro Z brace with stimulator to manage his pain. Mr. Rice also testified that pain could be totally disabling and that the side effects of pain medications could be totally disabling. Mr. Rice also agreed with [Hudson's] vocational experts that employers had a reluctance to hire applicants with a history of multiple back surgeries and also those applicants that were required to take morphine on a daily basis to control their pain. Based upon his testimony, the Court finds that [Dollar General's] vocational expert was not fully informed of [Hudson's] current medical and physical condition and that his opinion as to [Hudson's] 21% vocational loss was less credible."
The trial court concluded by finding:
 "Based upon the testimony of Dr. Danny Michael, vocational experts Dr. Nancy Crumpton and Virginia Spruce, and that of Ms. Hardigree, the Court finds the results of the FCEs to be highly questionable, unreliable, and not consistent with the evidence in the case. . . .
 "The testimony of [Hudson], which the Court finds credible, observations by the Court of [Hudson] in the courtroom and during times when [Hudson] did not know he was being observed, medical records, medical reports, vocational evidence, and the fact that [Hudson's] activities are severally impacted by the effects of his pain medications, support the Court's finding that the evidence, when taken as a whole, demonstrates that he has lost the ability to perform his trade or any reasonable gainful employment."
Dollar General filed a postjudgment motion; in denying Dollar General's postjudgment motion, the trial court made an entry on the trial docket specifying that "the evidence that [Hudson] is in chronic pain, has trouble sleeping, has trouble concentrating and that he takes narcotic medication (morphine twice a day) makes him unemployable and not a candidate for retraining." Dollar General timely appealed.
In addition to those findings stated in the trial court's judgment, the record reveals the following pertinent facts. At the time of the trial, Hudson was 33 years old. Hudson dropped out of high school and obtained his GED in 1996. He is certified as a "Windows 98 Poweruser," which allows him to work on computers that are under warranty. According to his testimony, Hudson built his home computer by himself. Hudson testified that he spent his free time before the injury "playing ball," riding bicycles, and going to movies with his 14-year-old son. Hudson testified that since the accident, his daily activities are limited to watching television, lying in bed, and using the household computer.
At the time of the accident, Hudson worked as a manager for Dollar General. His duties as manager consisted of unloading trucks, stocking shelves, operating the cash register, completing paperwork, and training and hiring employees. Hudson testified that, in addition to the sales job that lasted one day, he had attempted to *Page 733 
open a sales business from his home but that the business had failed.
Hudson initially sought treatment from Dr. Walter Wilson. Dr. Wilson prescribed pain medication and steroids and took X-rays. Hudson visited Dr. Wilson approximately eight times. After being treated by Dr. Wilson, Hudson visited Dr. Donald Slappey. According to Hudson, after a brief consultation, Dr. Slappey told Hudson that, in his opinion, Hudson did not need medical treatment. Hudson testified that he then visited Dr. Martin Jones who, after taking X-rays and performing an MRI, told Hudson that, "sometimes in life people just have to deal with a little pain." Hudson visited Dr. Jones only twice. Hudson stated that he experienced constant pain in his back throughout the period that he sought treatment from those doctors.
Thereafter, in February 2001, Hudson sought treatment from Dr. Danny Michael. Much of the evidence regarding Dr. Michael's treatment of Hudson is summarized in a portion of the trial court's judgment quoted earlier in this opinion. Subsequent to his first surgery, Hudson underwent the first of two functional capacity evaluations ("FCEs") in March 2002. Deanna Hardigree, an occupational therapist, performed the first FCE and rated Hudson as being in the "medium" job category. At that time, Dr. Michael determined that Hudson had reached maximum medical improvement. Dr. Michael assigned Hudson a 12% permanent-impairment rating and opined that Hudson could return to work within the limits set forth in the first FCE.
After the second surgery, Hudson completed the second FCE in August 2003. Based on the results of the second FCE, Dr. Michael expressed an opinion that Hudson could return to work within the limits of the second FCE. Dr. Michael also opined that the longer a patient such as Hudson remains out of work, the more pain that patient will experience upon returning to work. Dr. Michael referred to this condition as a patient being "deconditioned," and he described the pain as slowly subsiding with each instance of physical activity. Dr. Michael expressed an opinion that Hudson could return to work in a lessened capacity until his body became more accustomed to the increased activity.
Throughout most of his treatment of Hudson, Dr. Michael prescribed narcotic medication for Hudson. Hudson had been taking a combination of pain medications, including the prescription medications Mepergan, Avinza, and Kadian. Hudson has also taken muscle relaxers such as the prescription medications Skelaxin and Flexeril. Dr. Michael testified that Hudson takes approximately 30 pain pills a month. Hudson testified that at the time of trial he was still using narcotic pain medications and a "Micro Z brace with stimulator" to ease some of his pain symptoms.
Hudson described the medications as making him dizzy, unable to concentrate, and drowsy. Hudson also stated that he is able to sleep for only two or three hours at a time because of the pain he experiences. Hudson's mother testified that Hudson, in mid-sentence, would "gaze out into space" as a result of the side effects of his medications. Hudson's mother also described Hudson's not being able to get comfortable because of the pain he experiences and not being able to help her in the daily chores of household living.
Hudson met with the three vocational experts before trial. Dr. Nancy Crumpton met with Hudson and determined that Hudson was 100% disabled. Based on her discussion with Hudson, Hudson's level of pain, and the side effects of the medications, Dr. Crumpton opined that, at best, *Page 734 
Hudson would be a candidate for "sheltered work." Dr. Crumpton testified that Hudson told her that sitting was his most comfortable position; however, at trial Hudson testified that that was no longer true. Dr. Crumpton testified that Hudson drove himself to the evaluation that she conducted and that he sat for approximately two hours during the interview. Virginia Spruce also determined Hudson to be 100% disabled. Spruce testified that, if Hudson were not on pain medications and if he were able to sit through the training sessions, he would be a candidate for retraining. Eddie Rice assigned Hudson a 21% disability rating. Rice also stated that, even if the second FCE were wrong and Hudson should have been placed in the "medium" work category, he would assign Hudson only a 31% disability rating.
On appeal, Dollar General contends that the trial court's determination that Hudson was permanently and totally disabled was not supported by substantial evidence. When this court reviews a trial court's judgment in a workers' compensation case, that judgment will not be reversed if it is based on factual findings that are supported by substantial evidence. §25-5-81(e)(2), Ala. Code 1975. Our supreme court has defined substantial evidence as "evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved."West v. Founders Life Assurance Co. of Florida, 547 So.2d 870,871 (Ala. 1989). Further, this court reviews the facts "in the light most favorable to the findings of the trial court."Whitsett v. BAMSI, Inc., 652 So.2d 287, 290 (Ala.Civ.App. 1994), overruled on other grounds, Ex parte Trinity Indus.,Inc., 680 So.2d 262 (Ala. 1996). This court has also concluded: "The [1992 Workers' Compensation] Act did not alter the rule that this court does not weigh the evidence before the trial court."Edwards v. Jesse Stutts, Inc., 655 So.2d 1012, 1014
(Ala.Civ.App. 1995). However, our review as to purely legal issues is without a presumption of correctness. See Holy FamilyCatholic School v. Boley, 847 So.2d 371, 374 (Ala.Civ.App. 2002) (citing § 25-5-81(e)(1), Ala. Code 1975).
"`The trial court has much discretion in determining the loss of ability to earn and may consider such factors as age, education, past work history, and the effect of the injury on the employee's earning ability.'" G.UB.MK. Constructors v.Traffanstedt, 726 So.2d 704, 708 (Ala.Civ.App. 1998) (quotingPaschel v. Emro Mktg. Co., 632 So.2d 971, 973 (Ala.Civ.App. 1993)). Additionally, the assignment of the extent of disability is within the trial court's discretion and cannot be disturbed on appeal if there is evidence to support that decision. GoldenPoultry Co. v. Staggs, 660 So.2d 1348, 1352 (Ala.Civ.App. 1995).
"Permanent total disability" is defined in § 25-5-57(a)(4)d., Ala. Code 1975, to include "any physical injury or mental impairment resulting from an accident, which injury or impairment permanently and totally incapacitates the employee from working at and being retrained for gainful employment." Total disability does not mean absolute helplessness; rather, it means that the employee is not able to perform his or her trade and is unable to obtain other reasonably gainful employment. Mayfield TruckingCo. v. Napier, 724 So.2d 22, 23 (Ala.Civ.App. 1998). In making its disability determination, the trial court is not bound by expert testimony but must consider all the evidence, including its own observations, and interpret it to its own best judgment.G.UB.MK Constructors v. Traffanstedt, supra. The trial court *Page 735 
may consider the employee's own subjective complaints of pain in determining disability. Elite Transp. Servs. v. Humphreys,690 So.2d 439 (Ala.Civ.App. 1997).
As part of its argument on this issue, Dollar General contends that the trial court erred by failing to explicitly find in its judgment that Hudson cannot be retrained. The trial court, however, is not required to make a specific finding that an employee cannot be retrained because such a finding is implicit when the trial court concludes that the employee is permanently and totally disabled. Thompson Co. Contractors v. Cole,391 So.2d 1042, 1046 (Ala.Civ.App. 1980). In this case, in ruling upon Dollar General's postjudgment motion, the trial court did make a specific finding that Hudson could not be retrained: "The evidence that [Hudson] is in chronic pain, has trouble sleeping, has trouble concentrating and that he takes narcotic medication (morphine twice a day) makes him unemployable and not a candidate for re-training." That finding must be supported by substantial evidence. Mead Paper Co. v. Brizendine, 575 So.2d 571, 575
(Ala.Civ.App. 1990).
The trial court considered the medical opinion of Dr. Michael and detailed that evidence in its judgment. In addition, the trial court considered Hudson's testimony that he was constantly in pain as a result of his back injury. Hudson also testified that his daily activities are severely limited because of the side effects of the narcotic medications prescribed by Dr. Michael and that he has trouble concentrating because of the medications. Hudson's mother's testimony was consistent with that of Hudson. Hudson's presence afforded the trial court the opportunity to observe him in the courtroom and at times when "he did not know he was being observed." Further, the trial court stated that, in its opinion, Hudson's testimony was "credible."
Vocational experts Dr. Crumpton and Spruce determined Hudson to be 100% disabled. Dr. Crumpton and Spruce noted that, in their opinion, the FCEs were incomplete because the FCEs did not test crawling, kneeling, and balancing, and that, because Hudson had sustained a back injury, such areas should have been tested. Likewise, Dr. Crumpton and Spruce reviewed all of Hudson's medical records and were aware of his being prescribed narcotic medications and his use of the "Micro Z brace with stimulator." Unlike Dr. Crumpton and Spruce, Rice was unaware of Hudson's use of the "Micro Z brace with stimulator." The trial court determined that that made Rice's opinion less credible than those of Dr. Crumpton and Spruce. Rice did, however, agree with Dr. Crumpton and Spruce that employers could be reluctant to hire people with severe back injuries or people using narcotic medications.
All three vocational experts and Hardigree testified that Hudson's relatively young age, average intelligence, education, and aptitude were positive factors with regard to his maintaining employment. Hudson appeared coherent during the evaluations, and Hardigree testified that Hudson put forth a good effort during the second FCE. Dollar General argues that this evidence suggests Hudson is a candidate for retraining. The trial court weighed this evidence, however, and disagreed.
The record contains evidence that does tend not to support the trial court's disability determination, and it contains evidence that does support that determination. It is not within the province of this court to resolve any conflicts that might appear in the evidence before the trial court; rather, we must determine whether *Page 736 
those findings are supported by substantial evidence. West v.Founders Life Assurance Co. of Florida, supra. While this is a close case, the trial court had before it sufficient evidence to reach its conclusion. The findings of the trial court with regard to Hudson being permanently and totally disabled are supported by substantial evidence, and, therefore, the trial court's judgment is affirmed insofar as it finds Hudson to be permanently and totally disabled.
Dollar General, now represented by new counsel, also contends on appeal that the trial court erred in calculating Hudson's workers' compensation benefits by including fringe benefits in the calculation of Hudson's average weekly wage ("AWW"). Section25-5-1(6), Ala. Code 1975, governs the inclusion of fringe benefits in calculating the amount of workers' compensation benefit awards. Section 25-5-1(6) provides in part: "[AWW] shall not include fringe benefits if and only if the employer continues the benefits during the period of time for which compensation is paid. `Fringe benefits' shall mean only the employer's portion of health, life, and disability insurance premiums." If an employer continues to pay fringe benefits during the period for which compensation is awarded, the amount of those fringe benefits will not be included in the computation of the AWW. Wal-Mart Stores,Inc. v. Kennedy, 799 So.2d 188, 194 (Ala.Civ.App. 2001); Lowev. City of Bayou La Batre, 690 So.2d 424, 427 (Ala.Civ.App. 1997). Before trial, the parties stipulated that Hudson's AWW at the time of the accident was $450 with fringe benefits and $410.26 without fringe benefits.
Dollar General contended in its post-judgment motion and again on appeal that, in addition to paying Hudson's temporary-total-disability benefits, it paid Hudson's fringe benefits until Hudson was discharged on March 8, 2001. Thereafter, Dollar General asserts, it stopped paying Hudson's fringe benefits. Dollar General argues that because it paid the fringe benefits to Hudson until his dismissal, those benefits should not be included in the calculation of Hudson's AWW. SeeWal-Mart Stores, Inc. v. Kennedy, 799 So.2d at 194; Lowe v.City of Bayou La Batre, 690 So.2d at 427. However, given the evidence preserved in the record, we cannot address this issue.
It is well settled that an appellant has the burden of presenting a record containing sufficient evidence to show error by the trial court. Leeth v. Jim Walter Homes, Inc.,789 So.2d 243, 246 (Ala.Civ.App. 2000). It is not the duty of this court to search an appellate record for evidence to support an appellant's contention of error. Jenkins v. Landmark Chevrolet,Inc., 575 So.2d 1157, 1161 (Ala.Civ.App. 1991). "`This court cannot assume error, nor can it presume the existence of facts to which the record is silent.'" Alfa Mut. Gen. Ins. Co. v.Oglesby, 711 So.2d 938, 942 (Ala. 1997) (quoting Newman v.State, 623 So.2d 1171, 1172 (Ala.Civ.App. 1993)). The record is devoid of any evidence regarding fringe benefits, upon his termination, and Dollar General has failed to direct this court to any evidence that supports its argument on this issue. Therefore, we cannot say that Dollar General has demonstrated error with regard to the trial court's inclusion of fringe benefits in determining Hudson's AWW.
Dollar General also contends on appeal that the trial court erred by awarding Hudson compensation "for the rest of his life" rather than during the period of his permanent total disability. In Bostrom Seating, Inc. v. Adderhold, 852 So.2d 784, 796
(Ala.Civ.App. 2002), this court, relying on Thompson Co.Contractors v. Cole, supra, reversed a trial court's judgment insofar as it awarded the employee permanent-total-disability *Page 737 
benefits "`for the remainder of [the employee's] life.'" BostromSeating, Inc. v. Adderhold, 852 So.2d at 796. In so holding, we explained:
 "`Section 25-5-57(a)(4)a provides that compensation for a permanent and total disability is to be paid "during such permanent total disability."
 "`As clearly provided by the Code section, the period of compensation for permanent total disability lasts only so long as the disability continues. Should the disability cease to be other than total at some future time, the compensation for permanent total disability could be terminated. § 25-5-57(a)(4)b, Code of Alabama 1975. Thus, the trial court's award is an incorrect application of the statute.'"
Id. (quoting Thompson Co. Contractors v. Cole,391 So.2d at 1046). See also BEK Constr. Co. v. Reeves, 898 So.2d 738, 752
(Ala.Civ.App. 2004) (reversing trial court's award of permanent-disability benefits to the worker "for the `rest of his life'"). Therefore, the judgment of the trial court, insofar as it awards Hudson permanent-total-disability benefits for the rest of his life, is due to be reversed. The case is remanded for the trial court to enter a judgment consistent with this opinion.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
CRAWLEY, P.J., and PITTMAN, MURDOCK, and BRYAN, JJ., concur.