THOMAS, Judge.
In April 2001, Matthew Dingman was employed by Caseco, LLC, as an iron worker, working on a construction project in Huntsville. On April 18, 2001, Dingman was injured when approximately 3,000 pounds of bar joists fell on his left leg and ankle, pinning him to the floor. Dingman was freed from the bar joists by his fellow employees and taken by pickup truck to the hospital. At the emergency room, Dingman’s leg was x-rayed; the X-rays revealed a fracture of his ankle.[1] Ding-man was given pain medication and his leg and ankle were immobilized by a “boot”; he was instructed to use crutches and to elevate his leg. He was also instructed to see an orthopedic physician in one week.
Dingman left Huntsville after the accident and went to recuperate at his mother’s home in Arcadia, Florida. On April 27, 2001, Dingman began treatment with Dr. Ronald Heromin, an orthopedist in Florida. Dr. Heromin’s medical records indicate that Dingman had a “nondisplaced trimalleolar fracture, left ankle.” Dr. He-romin placed Dingman’s lower left leg in a cast, instructed Dingman to place no weight on that leg, and prescribed Vioxx, a nonsteroidal anti-inflammatory medication, and Vicoprofen, a combination of hydroeo-done and ibuprofen.
After removing Dingman’s cast on July 6, 2001, Dr. Heromin permitted Dingman to return to work. Dr. Heromin’s notes indicate that the ankle fracture was healing well and “show[ed] good consolidation.” Over the next nine months, Dingman visited Dr. Heromin on two occasions and reported pain and swelling at those office visits. Dr. Heromin’s notes indicate that X-rays showed “the [ankle] mortise to be intact and show[ed] the fracture to be in good position and alignment with good consolidation throughout” and that Dr. He-romin concluded that Dingman had “a mild effusion with synovitis in the left ankle.” To address Dingman’s symptoms, Dr. He-romin administered steroid injections in Dingman’s ankle on December 21, 2001, and April 4, 2002. Dr. Heromin’s notes also indicated that Dingman “was a very courageous man doing what he does eon- *912 sidering his ankle pain” and noted that Dingman had “worked through the pain.”
By October 11, 2002, Dingman was complaining to Dr. Heromin that his ankle caused him persistent pain and that the pain had been increasing and prevented him from sleeping. According to Dr. He-romin’s notes, X-rays of the left ankle showed a complete consolidation of the fracture; however, Dr. Heromin’s notes also reflected that those X-rays revealed posttraumatic moderate to moderately severe degenerative joint disease, which had resulted in narrowing through the ankle and of the ankle mortise. Dr. Heromin’s physical examination revealed that Ding-man’s arcs and ranges of motion in his ankle were decreased and that Dingman had severe swelling in his ankle. Dr. He-romin administered another steroid injection. His notes reflect that Dingman should remain off of work because he could not comfortably ambulate. Dr. Heromin prescribed icing and elevation of the ankle and indicated that a follow-up appointment should be made in three to four months.
When Dingman returned to Dr. Hero-min’s office on December 16, 2002, Ding-man continued to complain of “severe constant weight-bearing pain” in his left ankle. Dr. Heromin noted that the X-rays of Dingman’s ankle continued to show “degenerative osteoarthritic changes correlating with chronic posttraumatic moderate to moderately severe degenerative joint disease” and revealed another fracture in Dingman’s ankle. Dr. Hero-min ordered that Dingman have an MRI and a CT scan to further investigate the fracture Dr. Heromin noticed on the X-ray. He also administered another steroid injection.
On January 24, 2003, Dingman returned to Dr. Heromin for a follow-up appointment after his MRI and CT scan. Both tests, according to Dr. Heromin’s notes, revealed that the fracture in Dingman’s ankle, although just discovered on the X-ray, was an old fracture. At that point, only around a month after Dingman’s fourth steroid objection, Dingman reported that he was doing well; the physical examination performed by Dr. Heromin revealed only slight pain with palpation and a good range of motion in the ankle.
On September 23, 2003, Dingman again saw Dr. Heromin. In Dr. Heromin’s notes, he remarked that Dingman continued to complain of “some markedly elevated pain in his left foot especially after his walking around for a period of time during the daytime.” Dingman returned to Dr. Heromin one month later, on October 20, 2003; Dr. Heromin’s notes on that date indicate that Dingman suffered “increasing chronic pain to where he is now taking anti-inflammatories and pain medication on a regular basis.” Dr. Heromin’s notes also reflect that a recent MRI of Dingman’s left ankle “is pretty demonstrative in the destruction of his left ankle and notes [sic] why he is having so much pain.” The records state that the MRI “shows arthro-sis of the left ankle with subchondral marrow changes within the subtalar area,” “a chronic deltoid partial tear,” “a chronic ATF tear,” and “arthrosis of the anterola-teral aspect of the talus secondary to rubbing of the fibula.” Dr. Heromin referred Dingman to Dr. Roy Sanders for a second opinion.
Dr. Sanders’s medical records are exhibits to the record; he did not testify. Dr. Sanders performed three surgeries on Dingman’s left ankle. The first surgery, performed in February 2004, was an arthroscopic debridement and ligament reconstruction. After the surgery, Dingman healed well and was returned to work without restrictions on June 15, 2004. On July 13, 2004, however, Dr. Sanders’s notes indicate that Dingman was complaining of a considerable amount of pain in the *913 ankle and foot. After a CT scan confirmed the existence of arthritis in Dingman’s ankle that was the cause of the pain Ding-man suffered, Dr. Sanders informed Ding-man that a subtalar fusion of the ankle would be necessary in the near future; however, Dr. Sanders recommended that Dingman not have surgery right away and Dingman agreed. Dr. Sanders continued to prescribe anti-inflammatory medication and prescribed no narcotic pain relievers.
Dr. Sanders again discussed the possibility of an ankle-fusion surgery with Ding-man in February 2005. Dr. Sanders’s notes indicate that he explained that a fusion surgery was the only intervention Dr. Sanders felt would benefit Dingman at that point. Dingman, however, according to Dr. Sanders’s notes, was reluctant to consider another surgery.
Dr. Sanders’s colleague, Dr. David Her-son, a pain-management specialist, treated Dingman for pain between March 2005 and January 2006. Dr. Herson prescribed several different narcotic pain relievers for Dingman over the course of his treatment. In January 2006, Dr. Herson also prescribed Prozac for Dingman to treat depression.
On January 17, 2006, Dingman returned to Dr. Sanders for further treatment. Dr. Sanders’s notes refer to Dingman’s persistent pain and to osteophytes within the ankle structure and posttraumatic arthritic changes in the medial aspect of the tibiota-lar joint. Dr. Sanders recommended another ankle arthroscopy to debride the ankle and the osteophytes. Dr. Sanders’s notes indicate that the arthroscopy would be a diagnostic tool as well, permitting him to “visualize the arthritic changes in the ankle joint.”
Dr. Sanders performed the second arthroscopic procedure on Dingman’s ankle on January 26, 2006. Dr. Sanders’s surgery notes indicate that Dingman’s tibiotalar joint was “almost completely socked in by extensive hypertrophic fibrous tissue.” The report also indicates that large osteo-phytes were present. The surgery notes indicate that the fibrous tissue was debrid-ed and that the osteophytes were removed.
Dr. Herson’s notes indicate that he saw Dingman on February 1, 2006, shortly after his surgery. At that point, Dingman again reported pain in his ankle and that he was not sleeping well as a result. Dr. Herson noted that Dingman’s gait was an-talgic and that he was using a walker.
Dingman saw Dr. Sanders for a followup appointment on February 14, 2006. Dr. Sanders’s notes indicate that he showed Dingman the operative notes and that he discussed with him that the ar-throscopy procedure revealed “over 90% involvement of his tibiotalar joint in terms of grade IV chondral changes with extensive scar tissue throughout.” Dr. Sanders’s notes reflect that Dingman reported no improvement in his pain level after the January 26, 2006, arthroscopy and that Dingman desired a more definitive treatment. Dr. Sanders recommended an ankle-fusion surgery, which Dingman agreed to undergo. Dr. Sanders performed that surgery on March 1, 2006.[2]
Dingman next saw Dr. Herson for pain treatment on March 10, 2006. Dr. Her-son’s notes indicate that Dingman complained of pain in his left ankle and that the pain was improved but not relieved by a narcotic pain reliever. Dr. Herson noted that Dingman’s gait was antalgic. He prescribed Dingman more narcotic pain relievers and additional Prozac. In April *914 2006, Dr. Herson’s notes reflect that Ding-man returned, complaining of continued pain, although the pain had improved some. Dr. Herson changed Dingman’s narcotic pain reliever to Vicodin, reissued Dingman’s Prozac prescription, and prescribed Elavil, another pain reliever. Dr. Herson again noted that Dingman’s gait was antalgic.
On May 3, 2006, Dingman again visited Dr. Herson. At that point, according to Dr. Herson’s notes, Dingman complained of pain of only 3 on a 10-point scale and reported that Vicodin had helped manage his pain. Dr. Herson’s notes also reflect that Prozac was assisting Dingman with his depression. Again, Dr. Herson noted that Dingman’s gait was antalgic.
On May 25, 2006, Dr. Sanders removed Dingman’s cast. Dr. Sanders placed Ding-man in a boot, and he ordered Dingman not to bear any weight on his left ankle. On June 5, 2006, Dingman saw Dr. Herson again. At that time, according to Dr. Her-son’s notes, Dingman reported that his pain was a 5 on a 10-point scale and that Vicodin continued to help with the pain. Dr. Herson’s notes again indicate that Dingman’s gait was antalgic.
On July 6, 2006, Dr. Sanders’s notes reflect that Dingman was permitted to begin bearing weight on his left ankle. Dr. Sanders’s notes indicate that Dingman did not complain of pain and only relayed experiencing minimal discomfort. Dingman next saw Dr. Herson on July 12, 2006, at which time, according to Dr. Herson’s notes, Dingman complained of pain of 5 on a 10-point scale. Dr. Herson’s notes again indicate that Dingman’s gait was antalgic.
On August 15, 2006, Dr. Sanders’s notes reflect that Dingman had no complaints. Dr. Sanders indicated in his notes that Dingman was at full weight bearing and that he should undergo a functional capacities evaluation (“FCE”). Dingman saw Dr. Herson on August 16, 2006, at which time he complained of pain of 6 on a 10-point scale. Dingman reported to Dr. Herson that Vicodin and Elavil helped his pain and that Vicodin made it easier for him to walk; however, Dingman reported that walking made his pain worse. Again, Dr. Herson’s notes describe Dingman’s gait as antalgic. Dr. Herson continued all Dingman’s medications, including his Prozac to treat depression. On September 13, 2006, however, Dr. Herson’s notes indicate that Dingman reported the same level of pain, that Dr. Herson changed Dingman’s narcotic prescription from Vicodin to Lor-tab, and that Dr. Herson changed Ding-man’s antidepressant medication from Prozac to Cymbalta.
On October 6, 2006, and March 19, 2007, Dingman saw Dr. Herson to report continued pain. Dr. Herson continued to treat Dingman’s pain with narcotic pain relievers. Notably, on the notes from both of those dates, Dr. Herson reported that Dingman’s gait was normal.
Dingman next saw a doctor for his ankle in July 2008, after he relocated to Nashville, Tennessee. Dingman began treatment with Dr. Jeffrey Willers on July 7, 2008. Dr. Willers testified via deposition. Dr. Willers testified that Dingman had developed posttraumatic arthritis in his subtalar joint as a result of his 2001 injury combined with Dingman’s use of his ankle to walk, Dingman’s extreme weight (290 pounds in July 2008), and the effects of the surgeries he had already had on his ankle. According to Dr. Willers, after an ankle-fusion surgery like the one Dingman had already undergone, development of arthritis in an adjacent joint is a normal occurrence. Dr. Willers agreed that Dingman’s weight and his use of his ankle while walking and otherwise performing his employment activities could have accelerated the progression of his arthritis. However, Dr. Willers did not believe that Dingman’s ar *915 thritis was caused by his intervening employment with DeSoto Correctional Facility (“DeSoto”), at which he had worked as a correctional officer from November 2002 to January 2006,[3] or with Schwann’s Food Service, at which he had worked as a route salesman from August 2007 to August 2008.
Dr. Willers performed a second ankle-fusion surgery on Dingman on August 18, 2008. Dr. Willers testified that Dingman had a lot of arthritic changes in his subta-lar joint and that the fusion surgery would hopefully resolve some, but not all, of Dingman’s pain. Although Dingman reported a decrease in his pain during October and November 2008, after he healed from surgery, Dingman reported increasing discomfort in his foot in January 2009 and said it seemed like the pain was worse than before the surgery. At his March 6, 2009, appointment, Dingman also reported a pain originating in his lower back that radiated down his left leg to his ankle. Dr. Willers noted that, in his opinion, the likelihood of a causal link between the 2001 accident and Dingman’s lower-back pain was “very low.” However, he admitted that Dingman had limped, probably since his earlier fusion in 2006, and that alterations in gait could possibly lead to back problems. Dr. Willers also testified that Dingman would always suffer some degree of pain as a result of his ankle injury.
Dr. Willers did admit that his notes reflected a belief that Dingman’s pain response appeared, in his opinion, to be exaggerated. Dr. Willers indicated that Dingman’s pain reaction to his examination was more than would be typically expected based on Dingman’s history. Even after Dr. Willers performed surgery on Ding-man, Dr. Willers said that he could find no objective basis for the severity of Ding-man’s pain. However, Dr. Willers noted that pain was very subjective and that it would be hard to know if Dingman were actually magnifying his pain. Dr. Willers completed a clinical pain assessment in January 2009, on which he indicated that Dingman’s “pain [was] present to such an extent as to be distracting to adequate performance of daily activities or work” and that “physical activity, such as walking, standing, bending, stooping, moving of extremities” would “greatly increasef ] pain and to such a degree as to cause distraction from task or total abandonment of task.”[4] According to Dr. Willers, he based his answers on the assessment on Dingman’s subjective reports of pain. Interestingly, Dr. Willers noted on the assessment form that, to his knowledge, Dingman was not on any medications other than over-the-counter pain relievers. However, Dingman was being treated for pain and was being prescribed narcotic pain relievers by Dr. Hill, as will be discussed later in this opinion.
According to Dr. Willers, Dingman could not return to any of his former occupations: iron worker, corrections officer, or delivery driver. However, Dr. Willers said he did not think that Dingman was permanently and totally disabled as a result of his ankle injury. Dr. Willers also noted that Dingman had not reported or exhibited any symptoms of depression to him until July 2009, when Dingman had telephoned the office and had been directed to contact an emergency room for his suicidal thoughts. After Dingman recovered from his surgery, Dr. Willers determined that no other medical or surgical intervention *916 remained to assist Dingman in his recovery from his ankle injury. Dr. Willers then referred Dingman to a pain-management specialist, Bradley C. Hill, D.O., for the treatment of his chronic pain.
Dingman’s first appointment with Dr. Hill was on February 5, 2009. Dr. Hill also testified via deposition. He explained that he treated Dingman for his chronic pain with narcotic pain medication, including low-dose morphine and Opana to treat sematic pain, anti-inflammatory medications like Relafen to treat inflammation, and Neurontin to treat neurological pain. Dr. Hill also prescribed Ambien as a sleep aid for Dingman. Like Dr. Willers, Dr. Hill opined that Dingman’s work at DeSo-to and with Schwann’s and Dingman’s weight could have contributed to the pain in his ankle.
In June 2009, Dingman specifically reported being depressed to Dr. Hill; according to Dr. Hill, Dingman had earlier expressed frustration and aggravation over the continued problems with his ankle and chronic pain resulting from his earlier injury. Dr. Hill noted that Dingman’s depression was multifactorial, being caused by the fact that Dingman was having financial and marital problems triggered by his inability to work because of his ankle injury and resulting chronic pain. Dr. Hill opined that Dingman’s ankle injury and chronic pain resulting from that injury were the major contributing factor to Dingman’s depression. In August 2009, Dr. Hill said that Dingman relayed to him specific suicidal ideations, including using a gun and pulling out in front of an oncoming tractor-trailer. According to Dr. Hill, chronic pain and depression “go hand in hand” in younger patients. Dr. Hill opined that Dingman’s depression would need to be treated before he could resolve his pain issues.
Dr. Hill opined that Dingman is not totally disabled as a result of his ankle injury or his chronic pain. Dr. Hill said that he believed that Dingman had a significant and legitimate pain problem that has progressed for a long period and that Dingman would have some degree of chronic pain for the rest of his life. According to Dr. Hill, pain is purely subjective; he said that no one could say that after an ankle-fusion surgery someone’s pain should be at a certain level based on certain activities. Dr. Hill testified that Dingman wanted to work but that Ding-man could not adjust his expectations. Dr. Hill said that Dingman needed to accept his injury and the resulting limitations and set new goals for himself. However, Dr. Hill also noted that Dingman would have been devastated by the news that nothing more could be done to improve his condition and that he could likely no longer work.
Dingman underwent an FCE on March 2, 2009. The results of that FCE indicated that Dingman could lift 40 pounds from the floor to his waist, lift 25-30 pounds from his waist to overhead, sit constantly, stand frequently, and walk occasionally. According to the FCE, Dingman should avoid ladder climbing and squatting. Based on the FCE results, Dingman should be able to perform work in the medium work classification.
Dingman himself testified about his educational and employment histories, his 2001 accident, his ankle injury, his surgeries, his pain, and the impact his ankle injury has had on his life. Dingman, who was age 35 at the time of the trial, explained that he had dropped out of high school in the 10th grade but that he had received his GED. Since high school, Dingman had undertaken several forms of education, including a three-year period of study at the Free Gospel Bible Institute, an unaccredited institution, after which he received a certificate but no degree. *917 Dingman had also been trained as an EMT during a four- to five-month period of study at Edison Community College and as a correctional officer during a six-month course in criminal justice for corrections officers at South Florida Community College. Dingman also received training as a volunteer fireman and in several disciplines relevant to his career as a corrections officer, including weapons training, cell extraction, and emergency preparedness for correctional officers.
Dingman has had a significant work history. He began work as a teenager as a bag boy for two different grocery stores. Since that time he has delivered pizzas, moved furniture, pumped gas and performed oil changes, performed tree trimming, cleared paths for land surveyors, performed body removal for the medical examiner’s office, served as a security gate guard, and served as a 911 emergency dispatcher. Dingman then worked for Ca-seco, during which time he was trained in two different types of welding and in steel fabrication.
After Caseco ceased operations in July 2002, Dingman looked for work in Florida; he was hired as a correctional officer at DeSoto in Arcadia, Florida, in November 2002. Dingman was employed at DeSoto until March 2007, when he was asked to resign from his position because, he said, he did not “bounce back fast enough for them” from his first ankle-fusion surgery in March 2006.
Dingman was unemployed for a short time, and then he relocated to Tennessee, where, in August 2007, he began working as a route salesman for Schwann’s, a company that provides frozen foods for consumers via door-to-door sales and home delivery. Dingman drove a delivery truck and made 60 to 80, or sometimes as many as 100, calls on customers each day; Ding-man often worked 12-hour days and worked 6 days per week. He would take orders and deliver orders to his customers, which often required that he make more than one trip from his truck to the customer’s door. After his second ankle-fusion surgeiy in August 2008, Dingman said, Schwann’s would not allow him to return to work.[5]
Dingman explained the 2001 accident in his testimony. He said that he was working with a crew to raise bar joists to form the roof of a building. A crane was moving a bundle of 10 of the bar joists; each bar joist was 3 feet wide and 35 feet long. As Dingman was signaling the boom operator to lower the bundle of bar joists, the strap securing them came loose and the bar joists fell, landing on the inside of Dingman’s left leg, pinning him to the floor.
Dingman said that he was x-rayed and immobilized at the emergency room but that he was not otherwise treated. He did receive pain medication. Dingman testified that he was instructed to see an orthopedic physician as soon as possible. Dingman explained that he went to Dr. Heromin for treatment, which treatment Dingman described as “casting] it” and “keeping] me on Vicodin”; Dingman also said that Dr. Heromin gave him cortisone shots. Dingman said he returned to work at Caseco on July 7, 2001.
Dingman said that Dr. Heromin referred him to Dr. Sanders, who preformed three surgeries on Dingman’s ankle. Dingman said that Dr. Sanders performed an arthoscopy on his ankle in February 2004 and in January 2006. According to Dingman, neither arthroscopic procedure afforded him any benefit, so, at Dr. Sand *918 ers’s recommendation, Dingman said, he chose to have ankle-fusion surgery, which Dr. Sanders performed in March 2006. Dingman said that the ankle-fusion surgery also failed to benefit him; he said that he had to learn to walk again and that he had “walked funny” ever since the 2006 ankle-fusion surgery.
When Dingman moved to Tennessee in 2007, he began treatment with Dr. Willers. According to Dingman, Dr. Willers monitored his condition for some time and then recommended a second ankle-fusion surgery, which Dr. Sanders had previously explained would eventually be necessary. Dr. Willers performed the second ankle-fusion surgery in August 2008. Dingman said that the 2008 ankle-fusion surgery did not benefit him in any way. He said “I’m not right and I don’t believe I ever will be unless I do decide to have an amputation.”
Dingman complained that, since his injury in 2001 and the subsequent surgeries in 2004, 2006, and 2008, he has developed lower back pain and nerve pain that begins at his left hip and runs to his ankle, which began in January or February 2009. Dingman described this pain as “crippling” and said that it “burns” “like ... electricity....” After Dr. Willers determined that no other intervention would improve his ankle, Dingman began treatment with Dr. Hill for Dingman’s chronic pain.
Dingman testified that he is on eight different medications to help him control his pain and as to the effects of his pain on his life. He takes Opana, a narcotic pain reliever, on a daily basis and Opana IR, an instant-release form of the same pain reliever, for break-through pain. Dingman takes Neurontin for nerve-related pain and uses Voltaren gel, a topical pain reliever that he rubs into his hip and ankle. He also takes Skelaxin, which is a muscle re-laxen Because the use of certain medications have resulted in a problem with acid reflux, Dingman takes Protonix for that symptom. Because Dingman has trouble sleeping, he takes Ambien CR. Finally, Dingman takes Aleve, an over-the-counter anti-inflammatory medication.
Dingman testified that, despite the use of Ambien CR, he does not sleep well. He explained his typical sleep pattern. Ding-man said that he goes to bed between 10:00 and 11:00 p.m. only to stay awake until around 3:00 or 4:00 a.m., at which time he might fall into a restless sleep from which he awakens several times. He said that he finally awakens and gets out of bed at around 10:00 or 11:00 a.m. Ding-man said that, “if he is lucky,” he gets three or four hours of actual sleep per night.
Dingman said that in a typical day he spends no more than a combined total of 2½ to 3 hours walking around during any 24-hour period. He explained that he would not be up and around during the entire period but that he might be up for some short periods throughout the day between resting on the couch. The remainder of the day, he said, he spent reclining on the couch.
Dingman described his pain level as exceeding a 10 on a 10-point scale. He said that he would rather be kicked by a horse than to go through what he goes through. He testified that he spends a large portion of his day on the couch because of the pain. Dingman described having difficulty sometimes arising from the couch without falling; he explained that, at times, the pain would “put me on the floor” and that he would have to crawl on the floor until he could find a way to get back up to a standing position. Dingman said that any day that he did not fall he considered a good day.
Dingman also testified about the side effects of his medications. He said that his pain medications make him “feel like he is in zombie land.” He also said that he *919 suffers from constipation as a result of his medications. However, Dingman testified that the most serious side effect of his medications was the depression from which he suffered. He said that he was depressed because of a combination of things in his life, all of which stemmed from his 2001 injury, the resulting surgeries, and the chronic pain from which he suffers. Dingman explained that his depression, in the months leading up to trial, had worsened to such an extent as to make him attempt to take his own life through overdosing on his pain medications.
Dingman explained that he felt that, at age 35, he was in the prime of his life and yet he could not work and provide for his family because of the injury, the surgeries, and the resulting chronic pain. He said that he suffered from financial problems and marital problems that he directly traced to his inability to work due to the 2001 injury. According to Dingman, he went from “making good money to nothing.” He said that his wife had gotten tired of his inability to work and make a living and that she was also tired of his “not being in his right mind because of the medication.” He further testified that “not being able to do what [he] need[ed] to do, whether it be around the house or working a job, it’s just pretty much pushed [him] over the edge.”
Dingman said that he had first sought medical assistance for his suicidal thoughts on July 29, 2009, when he telephoned Dr. Willers’s office complaining of feeling depressed and suicidal. Dr. Willers’s nurse directed him to the emergency room. Dingman went to Cumberland Medical Center (“CMC”), but the staff there sent him home with instructions to see Cumberland Mental Health. Dingman said he tried to secure an appointment at Cumberland Mental Health but that he was told that he needed to pay $200 up front before being seen and treated. On August 13, 2009, he returned to CMC, at which time he told the staff that he was not trying to kill himself although he had ingested an overdose of his medications.
On September 11, 2009, Dingman went to Cookeville Medical Center after another overdose of his medications. He was kept overnight and released to Plateau Mental Health. Dingman said that he had really wanted to end it all at the time of this attempt at suicide.
Dingman testified that he had not injured his ankle in any way while employed at DeSoto or by Schwann’s. He denied injuring his ankle while employed at DeSo-to when he injured his knee falling off of a horse when the stirrup broke. Dingman said that he had injured his knee when he fell from the horse and that he had had knee surgery as a result; however, he denied any lasting effects from the knee injury.
Dingman said that he and Dr. Willers had discussed his continued chronic pain and his inability to sleep and his need to lie down for extended periods each day. According to Dingman, Dr. Willers had told him that there was nothing more that could be done for Dingman’s ankle and that Dr. Willers had said that Dingman could not return to his old jobs as a iron worker, correctional officer, or delivery driver. Dr. Willers, said Dingman, advised Dingman to consider applying for Social Security disability benefits. Ding-man said that he had applied for disability benefits but that his application was still pending.
Dingman testified that he had always had as his goal to return to work. He said that the pain had become significantly worse since the 2008 ankle-fusion surgery. He characterized it as “going downhill drastically” and compared his current state unfavorably with his condition before the 2008 surgery, when he had worked, on *920 average, a 6-day week of 12-hour days. Dingman testified that he had sought work. He stated that he had put in over 100 online applications at various employers but that he had had only 10 interviews, none of which had resulted in an offer of employment. He indicated that two potential employers had declined to hire him, in part, because of the medications he was taking and their effect on him. He also noted that.one of those potential employers had indicated that he would not be permitted to get up and move around during the workday and another had questioned his ability to perform the job given his ankle fusion and the limitations on his ability to walk.
Two vocational-rehabilitation counselors testified at trial: Doug Miller, who testified for Caseco, and Joe Miller, who testified for Dingman. Both counselors conducted telephone interviews with Dingman, and neither performed any academic testing because Dingman had been tested in October 2002 in conjunction with his application for employment at DeSoto. The tests from 2002 indicated that Dingman read at the 12th grade level, performed math at the 11th grade level, and had a grasp of English at the 12th grade level.
Joe Miller testified that Dingman could no longer perform the job duties associated with his employment at Caseco, at De-Soto, or with Schwann’s. Although Joe Miller noted that Dingman had the aptitude and the ability to be retrained and that Dingman possessed some transferra-ble skills, Joe Miller concluded that Ding-man’s inability to work a regular schedule and his continuing medical problems would preclude his reentry into the job market. Joe Miller said that Dingman’s unsteadiness on his feet, his frequent falls, his need to lie down and rest to alleviate his chronic pain, and the side effects of his medications made it difficult to find employment suitable for Dingman. Joe Miller also said that Dingman’s narcotic medications, which would likely need to be disclosed to a prospective employer, could potentially frighten off an employer and precluded jobs that would require driving. According to Joe Miller, the pain forms completed by Dr. Willers and Dr. Herson indicated that Dingman would be distracted from his job duties by his chronic pain and that employers would not be likely to hire an individual knowing that he might frequently abandon his tasks or, if an employer were to hire him, that employer would be likely to terminate his employment once a pattern of abandoning tasks occurred. Joe Miller opined that Dingman was 100% vocationally disabled based on his pain, his continuing medical difficulties, and his problems with ambulation.
Doug Miller, in contrast, testified that, in his opinion, Dingman had suffered between 42% and 47% vocational disability. Doug Miller based his opinion largely on the fact that Dingman’s FCE results had indicated that he could perform work in the medium labor classification. Doug Miller expressed some reservation with Dingman’s ability to perform a medium-classification job, noting that many required the ability to drive, which Doug Miller opined, based on the evidence, was precluded by Dingman’s medications. However, Doug Miller opined that Ding-man could perform a sedentary or light-classification job, like hotel-desk clerk, data-entry clerk, telephone-order clerk, answering-service operator, a gate guard, or perhaps a dispatching job for a local company. Although Doug Miller admitted that, if one believed Dingman’s trial testimony about his pain, one could conclude that Dingman would not be employable, Doug Miller noted that Dr. Willers had suspected Dingman had magnified his pain and that Dingman’s FCE indicated that he had given consistent effort, which would *921 seem to be inconsistent with his complaints of debilitating pain. Doug Miller testified that Dingman was bright and that some of his job skills from prior employment should transfer to certain jobs that Doug Miller felt that Dingman could perform. In summary, Doug Miller could not conclude that Dingman was unemployable based on his FCE results and the testimony of his physicians, neither of which believed that he was permanently and totally disabled as a result of his ankle injury.
After trial, the trial court entered a judgment in favor of Dingman, concluding that Dingman was permanently and totally disabled and awarding benefits accordingly. The trial court specifically determined that Dingman suffered a nonscheduled injury to the body as a whole based on its conclusions that (1) Dingman’s excessive pain was such that it took Dingman’s ankle injury outside the schedule for permanent partial disability provided in Ala.Code 1975, § 25-5-57(a)(3); (2) that Dingman’s back problems and back pain had resulted from an altered gait caused by Dingman’s ankle-fusion surgeries, thus removing the ankle injury from the purview of the schedule; and (3) that Dingman had suffered a nonscheduled psychological injury — severe depression — that occurred as a result of his 2001 ankle injury, his four surgeries, and the chronic pain associated with his ankle injury. Caseco filed a post-judgment motion, which the trial court denied. Caseco appeals.
Our review of this case is governed by the Workers’ Compensation Act, Ala.Code 1975, § 25-5-1 et seq., which states, in pertinent part: “In reviewing pure findings of fact, the finding of the circuit court shall not be reversed if that finding is supported by substantial evidence.” Ala.Code 1975, § 25-5-81 (e)(2). Therefore, this court “will view the facts in the light most favorable to the findings of the trial court.” Whitsett v. BAMSI, Inc., 652 So.2d 287, 290 (Ala.Civ.App.1994), overruled on other grounds, Ex parte Trinity Indus., Inc., 680 So.2d 262, 269 (Ala.1996). Further, the trial court’s finding of fact is supported by substantial evidence if it is “supported by ‘evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.’ ” Ex parte Trinity Indus., 680 So.2d at 269 (quoting West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989), and citing § 12-21-12(d)). Our review of legal issues is without a presumption of correctness. Ala.Code 1975, § 25-5-81(e)(l); see also Ex parte Trinity Indus., 680 So.2d at 268.
On appeal, Caseco makes several arguments regarding the trial court’s determination that Dingman suffered a nonscheduled injury to the body as a whole instead of a scheduled-member injury to his foot or leg. Caseco attacks each of the trial court’s separate conclusions that Ding-man’s injury was not a scheduled-member injury because of Dingman’s pain, his back problems, and his depression. Because Caseco challenges the trial court’s determination that Dingman’s injury should be compensated outside the schedule, Caseco also argues that the trial court erred by permitting evidence of vocational disability. Caseco further argues that the trial court erred by concluding that Dingman’s current ankle problems are related to the ankle injury sustained in the 2001 accident and by determining that Dingman was permanently and totally disabled.
We will first address whether the trial court erred in concluding that Ding-man’s current condition resulted from his 2001 accident and was not caused by injuries occurring during Dingman’s employment at DeSoto or with Schwann’s. Case-co argues that Dingman’s work at DeSoto *922 and with Schwann’s was physically demanding and that both of those jobs could have aggravated Dingman’s condition such that Caseco would cease being responsible for that condition. Caseco relies on the last-injurious-exposure rule, which governs a determination of which of multiple insurance carriers or employers are responsible for an employee’s condition when the employee suffers successive work-related injuries.
“ ‘Under the last-injurious-exposure rule, the carrier covering the risk at the time of the most recent compensable injury bearing a causal relation to the disability bears the responsibility to make the required workers’ compensation payments. “The characterization of the second injury as a new injury, an aggravation of a prior injury, or a recurrence of an old injury determines which insurer is liable.” ’ ”
Hooker Constr., Inc. v. Walker, 825 So.2d 838, 845 (Ala.Civ.App.2001) (quoting Ex parte Pike County Comm’n, 740 So.2d 1080, 1083 (Ala.1999)) (internal citations omitted in Walker); see also Kohler Co. v. Miller, 921 So.2d 436 (Ala.Civ.App.2005) (applying the last-injurious-exposure rule to successive employers). The terms “aggravation” and “recurrence” themselves are not self-explanatory, so our cases have endeavored to clarify the difference between the two.
“A court finds a recurrence when ‘the second [injury] does not contribute even slightly to the causation of the [disability].’ 4 A. Larson, The Law of Workmen’s Compensation, § 95.23 at 17-142 (1989). ‘[T]his group also includes the kind of case in which a worker has suffered a back strain, followed by a period of work with continuing symptoms indicating that the original condition persists, and culminating in a second period of disability precipitated by some lift or exertion.’ 4 A. Larson, § 95.23 at 17-152. A court finds an ‘aggravation of an injury’ when the ‘second [injury] contributed independently to the final disability.’ 4 A. Larson, § 95.22 at 17-141.”
United States Fid. and Guar. Co. v. Stepp, 642 So.2d 712, 715 (Ala.Civ.App.1994).
The trial court soundly rejected Caseco’s argument that Dingman had suffered a new injury at one of his two subsequent employments. Instead, the trial court concluded, the evidence, including most importantly the testimony from Dr. Willers, supported the conclusion that Dingman’s original 2001 ankle injury was the cause of the subsequent problems with Dingman’s ankle joint. In fact, as the trial court pointed out, Dr. Willers stated that he could not attribute Dingman’s posttrau-matic arthritis to his employment at DeSo-to or with Schwann’s. Although Caseco emphasized the incident where Dingman fell off the horse while employed at DeSo-to, the trial court found that the record contained no evidence supporting a conclusion that Dingman’s ankle condition was worsened as a result of that fall. Based on our review of the record, indulging the presumption in favor of the trial court’s resolution of conflicting evidence and its evaluation of the veracity of the witnesses before it, see Walker, 825 So.2d at 842 (quoting Mayfield Trucking v. Napier, 724 So.2d 22, 25 (Ala.Civ.App.1998)) (“‘The resolution of conflicting evidence is within the exclusive province of the trial court, and this court is forbidden to invade that province upon review.... Further, it is well established that the trial court is in the best position to observe the demeanor and credibility of the employee and other witnesses in a workers’ compensation case.’ ”), we conclude that the trial court’s determination that Dingman’s ankle condition arose solely as a result of his 2001 accident at Caseco is supported by substantial evidence.
*923 We now turn to Caseco’s argument that the trial court improperly concluded that Dingman’s ankle injury should be compensated outside the schedule despite the fact that the ankle would be considered a scheduled member. As noted above, the trial court specifically found three independent bases upon which it based its determination that Dingman’s ankle injury should be compensated outside the schedule: Dingman’s chronic pain, Dingman’s back problems, and Dingman’s severe depression. Dingman points out that if even one of these bases is legally sound, the trial court’s determination that the ankle injury may be compensated outside of the schedule must be affirmed. Because we have determined that the issue whether Dingman’s depression will suffice to avoid the application of the schedule is determinative, we pretermit discussion of whether Dingman’s chronic pain or his back problems would also support the trial court’s conclusion that Dingman is not restricted to recovery of benefits prescribed by the schedule. See Favorite Market Store v. Waldrop, 924 So.2d 719, 723 (Ala.Civ.App. 2005) (stating that this court would preter-mit discussion of further issues in light of dispositive nature of another issue).
Caseco argues that the trial court could not base its determination that Ding-man’s depression would suffice to take his injury outside the schedule because, it says, the evidence did not indicate that Dingman’s depression was proximately caused by his 2001 ankle injury. Caseco is correct in arguing that, in order to receive workers’ compensation benefits based upon a psychological disorder, an employee must demonstrate that he or she “suffered a physical injury to the body and [that] that physical injury [is] a proximate cause of the psychological disorder[ ].” Ex parte Vongsouvanh, 795 So.2d 625, 628 (Ala. 2000). Thus, we must determine whether the evidence at trial supports the trial court’s conclusion that Dingman’s 2001 ankle injury was the proximate cause of his depression.
The trial court expressly relied on Dr. Hill’s testimony that chronic pain and depression often “go hand in hand” and Dr. Hill’s statement that Dingman’s ankle injury was a major contributing factor in Dingman’s depression in concluding that Dingman’s depression was proximately caused by his ankle injury. Other testimony recited by the trial court in support of its conclusion was Dingman’s testimony that he had wanted to return to work and that Dingman had believed that he would eventually do so until Dr. Willers told him that nothing more could be done to alleviate his ankle problems and that he could not return to any of his three most recent occupations. Dr. Hill’s testimony that such news would have been “devastating” to Dingman also persuaded the trial court that Dingman’s depression was linked to his ankle injury, which had worsened over time and had led to chronic pain with which, the evidence indicated, Dingman would likely have to live with in some degree for the rest of his life. Based on the trial court’s belief in Dingman’s testimony that he had desired at all times to remedy his ankle problems and return to work, the trial court concluded that facing the fact that he would not be able to resolve his ankle problems and return to meaningful employment prompted Ding-man’s depression. Although, as Caseco vehemently argues, the record suggests that financial and marital problems are also factors in Dingman’s depression, the law does not require that the employee’s injury be the sole cause of his depression. Ex parte Vongsouvanh, 795 So.2d at 627 (“Based on this evidence, we find it clear that Vongsouvanh’s mental disorders originated from both physical and emotional factors. Thus, the trial court should have applied the ‘eontributing-cause’ standard set forth in [Ex parte ] Valdez [, 636 So.2d 401, (Ala.1994) ].”); see also CVS Corp. v. *924 Smith, 981 So.2d 1128, 1136 (Ala.Civ.App. 2007) (affirming a trial court’s determination that an employee’s psychological disorder was proximately caused by her on-the-job injury when the evidence indicated that the injury “ ‘contributed to and/or exacerbated’ any psychological problems [the employee] was experiencing as a result of her preexisting pain”). In light of our standard of review in workers’ compensation cases, we cannot agree with Caseco that the trial court’s determination that Dingman’s depression was proximately caused by his 2001 ankle injury is not supported by substantial evidence. Thus, we must affirm that finding and the resulting conclusion that Dingman is not restricted to compensation under the schedule.[6]
Finally, we must address Caseco’s argument that the trial court’s conclusion that Dingman is permanently and totally disabled is not supported by the evidence.
“With regard to determining whether an employee is permanently and totally disabled, this court has stated:
“ ‘ “The test for total and permanent disability is the inability to perform one’s trade and the inability to find gainful employment.” Fuqua v. City of Fairhope, 628 So.2d 758, 759 (Ala.Civ.App.1993). See also Liberty Trousers v. King, 627 So.2d 422, 424 (Ala.Civ.App.1993). A “permanent total disability” is defined as including “any physical injury or mental impairment resulting from an accident, which injury or impairment permanently and totally incapacitates the employee from working at and being retrained for gainful employment.” § 25-5-57(a)(4)d., Ala.Code 1975; Russell v. Beech Aerospace Services, Inc., 598 So.2d 991, 992 (Ala.Civ.App. 1992).’
“Alabama Catfish, Inc. v. James, 669 So.2d 917, 918 (Ala.Civ.App.1995). See also Boyd Bros. Transp., Inc. v. Asmus, 540 So.2d 757, 759 (Ala.Civ.App.1988) (stating that § 25-5-57(a)(4)d., Ala.Code 1975, ‘requires that the employee be unable to perform his trade or unable to obtain reasonably gainful employment’).”
CVS Corp., 981 So.2d at 1136.
Caseco argues that only one witness testified that Dingman was unable to return to gainful employment: Joe Miller, Ding-man’s vocational expert. Dingman’s physicians, Caseco contends, testified that Dingman was not permanently and totally disabled. In addition, Caseco notes that Dingman himself testified that he desired to work and that he admitted that he had attested that he was ready, able, and willing to work when he applied for unemployment benefits in the State of Tennessee.[7] *925 Caseco further points out that Dingman’s FCE results indicate that he is capable of performing work in the medium classification and that Dingman had actually worked a demanding schedule with Schwann’s up until his 2008 ankle-fusion surgery. Finally, Caseco relies on the fact that Dingman has shown “stellar capacity to learn new skills,” as demonstrated by his years of training during his employment history.
Although we agree that Dr. Willers indicated that he did not think that Dingman was permanently and totally disabled, we note that Dr. Willers did indicate on a pain-assessment form that Dingman’s pain was such that it would interfere with concentration and both daily and work tasks even to such an extent as to cause Ding-man to abandon some tasks. Dr. Hill also stated that he did not think Dingman was permanently and totally disabled as a result of his ankle injury; however, Dr. Hill also testified that Dingman would believe that he was disabled if a physician, like Dr. Willers, indicated that Dingman might be disabled by suggesting that Dingman seek disability benefits. Dr. Hill also noted that he believed that Dingman suffered from significant chronic pain and that the chronic pain and its interference with Dingman’s activity level led to his severe depression; Dr. Hill opined that Ding-man’s depression had to be addressed before Dingman’s situation could change. Dr. Hill also admitted that returning Ding-man to meaningful employment would take “some work and education” and could not occur until Dingman accepted his injury and its resulting limitations.
The trial court found that Dingman’s testimony was credible. The trial court recounted that Dingman spent 21 hours out of every 24-hour period lying down to relieve his pain, that Dingman managed only 2 to 4 hours of restless sleep per night, and that Dingman took 3 pain medications on a daily basis, 2 of which had had dosage increases in the months before trial to address increased pain. As Caseco admits, Joe Miller testified that Dingman was 100% vocationally disabled. Finally, the trial court noted that Doug Miller, Caseco’s vocational expert, had testified that, if the trial court believed the limitations indicated in the pain-assessment form completed by Dr. Willers were an accurate reflection of the effect on Ding-man’s ability to function, Dingman would not be employable.
The test for permanent total disability does not require absolute helplessness. Dolgencorp, Inc. v. Hudson, 924 So.2d 727, 734 (Ala.Civ.App.2005). Although a trial court is certainly free to believe the testimony of the expert witnesses presented by the parties, it is not bound by that testimony. Elite Tramp. Servs. v. Humphreys, 690 So.2d 439, 441 (Ala.Civ.App.1997). As part of its duty of reconciling conflicting testimony, a trial court “may consider a worker’s testimony concerning subjective pain in its determination of disability.” Humphreys, 690 So.2d at 441; see also Hudson, 924 So.2d at 735. The testimony in the present case, although conflicting, is sufficient to support the conclusion that Dingman, because of his ankle injury, the chronic pain resulting therefrom, the side effects of his medications, and his depression, is permanently and totally disabled from gainful employment.
*926 Based on our standard of review, which requires us to view the evidence in the light most favorable to the findings of the trial court and to affirm the factual findings of the trial court if they are supported by substantial evidence, we must conclude that the record supports the trial court’s findings that Dingman’s current condition resulted from his 2001 ankle injury and that Dingman suffers from depression proximately caused by his 2001 ankle injury. Considering those factual findings, we cannot disagree with the trial court’s legal conclusion that Dingman is not restricted to the workers’ compensation benefits provided by the schedule for the injury to his ankle because of the psychological injury he has suffered, which is an unscheduled injury. The trial court’s conclusion that the evidence proves that Dingman is permanently and totally disabled as a result of his ankle injury, the resulting surgeries, his chronic pain, and his depression is also supported by the record. Thus, we affirm the trial court’s judgment awarding Dingman benefits for permanent and total disability.
AFFIRMED.
THOMPSON, P.J., and PITTMAN and BRYAN, JJ., concur.
MOORE, J., concurs specially.

. Medical records state that Dingman suffered an "acute transverse fracture though the medial malleolus.”

. The record does not contain an operative or surgical note regarding the March 1, 2006, ankle-fusion surgery.

. Although Dingman was employed at DeSoto until March 2007, the record reflects that he did not return to work after his January 2006 ankle arthroscopy and his March 2006 ankle-fusion surgery.

. Dr. Herson had given the same responses on a similar assessment in June 2005.

. However, Doug Miller, a vocational-rehabilitation counselor who testified at trial, stated that he had received information indicating that Dingman had been fired because he refused to take on a different route.

. Caseco also argues on appeal that the trial court erred by permitting the introduction of evidence regarding vocational disability despite the fact that Dingman's injury was to a scheduled member. See Wehadkee Yam Mills v. Harris, 31 So.3d 150, 159 (Ala.Civ.App. 2009) (quoting Smith v. Michelin North America, Inc., 785 So.2d 1155, 1159 (Ala.Civ.App. 2000)) ("[Wjhen compensation is governed by the schedule, 'evidence of vocational disability cannot serve to further any recovery.' ”). Because we are affirming the trial court’s conclusion that Dingman is not restricted to recovery under the schedule, we need not consider Caseco's argument on this point.

. Caseco argues briefly on appeal that Ding-man should be judicially estopped from claiming that he is unable to work in order to seek workers’ compensation benefits in light of his admission that, when he applied for unemployment compensation, he affirmed that he was "ready, willing, and able to return to work.” Although the fact that Dingman had asserted that he was "ready, willing, and able to return to work” was mentioned in Caseco’s posttrial brief as a basis for rejecting Dingman’s argument that his pain was so severe that it should remove his ankle injury from the schedule, Caseco never once mentioned the theory of judicial estoppel or provided any legal argument concerning judicial *925 estoppel to the trial court. Therefore, we cannot consider Caseco’s judicial-estoppel argument. Ex parte Farley, 981 So.2d 392, 393 (Ala.2007) (Andrews v. Merritt Oil Co., 612 So.2d 409, 410 (Ala. 1992)) (" ‘This Court cannot consider arguments raised for the first time on appeal; rather, our review is restricted to the evidence and arguments considered by the trial court.’ ").