Hornady Truck Lines, Inc. ("Hornady"), appeals the trial court's judgment in favor of its former employee, Clyde Howard. In 1998, Howard suffered a head injury while working for Hornady. Howard sought workers' compensation benefits, alleging that the injury caused him to suffer recurring epileptic seizures. Pursuant to § 25-5-81, Ala. Code 1975, Hornady filed a complaint in the Monroe Circuit Court on August 10, 1999, requesting that the court determine whether Howard was entitled to workers' compensation benefits. Hornady argued that Howard was not entitled to benefits because he had misrepresented certain facts regarding his health history when he applied for a position with Hornady. Hornady also maintained that Howard was not suffering from epileptic seizures and that, even if he were, the seizures did not result from the 1998 on-the-job injury.
On August 28, 2000, the sole circuit judge for Monroe County entered an order recusing himself and appointing the Monroe County district judge to hear the case. The order stated: *Page 471 
 "This cause having come before the court and the court considering that the appearance of evenhanded fairness and justice would be served by a recusal, therefore,
 "In the interest of justice and for good cause, the court hereby enters this ORDER OF RECUSAL and recuses himself ex mero motu and appoints the [Monroe County district judge], to hear any and all matters in said case."
The parties did not move for the recusal, and the record does not indicate the reason for the circuit judge's recusal. Neither party objected to the district judge's assignment to the case before the final judgment was entered.
After the district judge was assigned, the parties conducted extensive discovery and Hornady moved for a summary judgment, which the trial court denied. On March 14, 2006, after a hearing at which it received ore tenus evidence, the trial court entered a detailed written judgment concluding that Howard was permanently and totally disabled and that he was entitled to workers' compensation benefits. The trial court awarded benefits accordingly.
On April 13, 2006, Hornady filed a post-judgment motion to amend or vacate the judgment pursuant to Rule 59, Ala. R. Civ. P., and expressly requested a hearing on the motion. Hornady argued for the first time in its postjudgment motion that the trial court lacked subject-matter jurisdiction over the case because the trial was presided over by a district judge and only a circuit judge had authority to hear the case; see §§ 25-5-81(a) and 25-5-1(18), Ala Code 1975. Hornady also argued that the trial court's findings of fact were not supported by the evidence, that Howard had failed to prove a causal connection between his seizures and the 1998 accident, and that a preponderance of the evidence supported Hornady's misrepresentation defense. The trial court did not hold a hearing on Hornady's postjudgment motion, and the motion was denied by operation of law on July 12, 2006, pursuant to Rule 59.1, Ala. R. Civ. P. Hornady filed a timely notice of appeal.
The evidence reveals the following relevant facts. Howard served in the United States Air Force during the late 1960s. His medical records show that he suffered a significant head trauma to his left front temporal region in 1966 and that he lost consciousness for a period of time as a result of the trauma. Beginning in May 1967, Howard began experiencing episodes during which he would develop weakness in his limbs. The weakness would increase to the point where Howard could not move anything except his eyes for 30 minutes to an hour. Howard described being conscious during those episodes, and he stated that he did not have difficulty breathing. Howard stated that after those episodes he would experience muscle weakness and fatigue for two to three days after he regained the ability to move.
In 1968, despite the fact that Howard did not lose consciousness during those episodes, doctors with the Air Force diagnosed him as having recurrent episodes of syncope, with the exact etiology (cause) unknown.[1] The episodes continued, and after more extensive testing in 1969, four different Air Force doctors independently and at different times diagnosed Howard with recurrent flaccid paralysis, with the exact etiology unknown.[2] During his testimony *Page 472 
before the trial court, Howard confirmed that he was aware of the doctors' diagnoses of paralysis; he stated, "Yeah, that's what they called it, recurrent paralysis." Additionally, on an Air Force form titled "Report of Medical History" that Howard filled out in late 1969, he answered "yes," indicating that he had a history of paralysis.
After his discharge from the Air Force in early 1970, Howard worked for several years as an over-the-road truck driver. Howard testified that he experienced one or two more episodes of paralysis, including one in 1986. In 1991, Howard was hospitalized for headaches; at that time, he reported that he had a history of several falls and injuries to his head. An electroencephalogram ("EEG") performed during Howard's 1991 hospitalization showed "mildly abnormal" results.
In April 1997, Howard was hospitalized because of an episode of paralysis like those he had previously experienced. The medical records show that Howard had "a history of having episodes like this" when he was in the Air Force. Howard's diagnosis upon admission to the hospital was "syncope." In May 1997, Howard was again admitted to the hospital with the same symptoms. This time, Howard's treating physicians diagnosed him with episodic paralysis. Howard's medical records show that he was more likely to have episodes of paralysis when he was under stress.
In June 1998, Howard applied to Hornady for employment as an over-the-road truck driver. Howard signed an application form which stated, "I . . . acknowledge and understand that misrepresentation as to pre-existing physical or mental conditions may void workers' compensation benefits." Hornady offered Howard employment conditioned on his completing a health history form and on his being certified by a physician as qualified to drive pursuant to Department of Transportation regulations.
On the health history form, Howard was asked to indicate whether, among other things, he had a history of "dizzy spells or fainting"; "epilepsy, fits, or convulsions"; and "paralysis, including polio." Howard marked "no" to each of those questions, indicating that he had no history of such health problems. Howard did write that he had been hospitalized in 1997, although he did not state why. The certification form completed by the physician who examined Howard showed that Howard had orally disclosed that he had experienced syncope. The document, however, contains no further details regarding Howard's health history. Other than the doctor's examination, the record does not show that Hornady performed any investigation into Howard's syncope or his 1997 hospitalization.
Despite his diagnosis of episodic paralysis in 1997 and his diagnoses of recurrent flaccid paralysis in 1969, and although he confirmed that the Air Force doctors had told him he had recurrent paralysis, Howard testified that he disclosed only that he had experienced syncope because he understood that the episodes were syncope. Hornady representatives testified that, had they known of Howard's history of episodic paralysis, the company would not have hired him as an over-the-road truck driver absent further examination and confirmation by a neurologist that he would not suffer episodes of paralysis in the future. Hornady's representatives testified that they would have been concerned with potential dangers to the public in allowing a person disposed to paralysis to drive an 80,000 pound vehicle.
Howard began working for Hornady as an over-the-road tractor-trailer driver in June 1998. As part of Howard's job, he *Page 473 
was required to cover his load with plastic and a tarp. On September 10, 1998, Howard loaded his trailer at a Hornady terminal and began covering it with a tarp. Howard fell from where he was standing on top of the load and injured his right shoulder, right knee, left leg, and head. Howard was also rendered unconscious for an unknown period of time. He was taken by ambulance to a hospital for treatment.
There were no witnesses to Howard's fall, and the evidence of record is not consistent regarding what caused him to fall. In Howard's statement given to Hornady shortly after the accident, he stated that he "was on top of the load unfolding [the] tarp and the next thing [he] knew [he] was falling." Records created at the time of the fall contain conflicting statements regarding the cause, including that Howard stepped backwards and fell, that he took a misstep, and that he slipped and fell. At trial, Howard testified for the first time that a wind caught the tarp that pulled him off of the load. When confronted with his deposition testimony that he did not remember falling, Howard stated that he did not remember the wind at the time of his deposition. Subsequently, when Howard was asked by his lawyer whether he had slipped and fallen from the load, he stated that he had.
For three months after the fall, Howard experienced dizziness and shoulder pain; both symptoms resolved upon medical treatment. Howard was released to return to work with no medical restrictions in late November 1998. Upon Howard's return to work, he received an increase in pay. Howard worked without incident for approximately three months.
In the early morning hours of March 4, 1999, Howard awoke at his home with leg cramps and went to his bathroom. Although he does not recall precisely what happened, Howard recalls that he fell, hit his head, lost consciousness, and awoke unable to talk or move, except for his eyes. Howard's wife testified that his body was jerking when she found him on the floor. Howard was taken to the hospital where he told the doctors that he had experienced episodes like this before, referring to his prior episodes of paralysis. Howard testified that, at the time, he did not believe that the March 1999 incident was related to his September 1998 fall.
A report made by Dr. Chandra Gehi during Howard's March 1999 hospitalization notes a "mildly abnormal EEG." Also, a psychiatrist, Dr. Edward Huggins, noted in a consultation report his impression that Howard suffered from conversion reaction due to stress. The trial court received testimony that conversion disorder is "a psychological diagnosis in which someone has a psychological problem, usually some type of stress, that is converted into a physical symptom."
Howard did not return to work after March 1999, and he experienced more and increasingly frequent episodes of body jerks and nonresponsiveness despite treatment with antiseizure medication. In May 1999, Howard was hospitalized with what may have been a stroke. On August 8, 1999, Howard was again hospitalized for complaints of seizures. The records from that hospitalization note "a longstanding history of pseudoseizures, stemmed from supposedly a fall and concussion received in 1998." The trial court received testimony from Hornady's expert witness that pseudoseizures, sometimes called nonepileptic seizures, are psychological or voluntary in nature and are not caused by abnormal electrical discharges in the brain. In contrast, seizures, typically referred to as epileptic seizures, result from abnormal electrical discharges in the brain that can be detected and measured by an EEG. *Page 474 
On August 10, 1999, Howard underwent extensive tests supervised by Dr. Raymond Faught, a neurologist specializing in epilepsy. The tests were performed in order to determine whether the episodes Howard suffered were epileptic seizures. Dr. Faught testified that Howard was admitted to the hospital where he was continually observed and monitored via videotape and an EEG for three days. During that hospitalization, Howard experienced an episode of body jerks and nonresponsiveness that his family described as typical of what he had experienced since March 1999. A videotape of the episode was admitted into evidence and viewed by the trial court. However, the videotape was not made a part of the record on appeal.[3] Dr. Faught testified that the EEG data recorded during the episode was normal.
Based on the EEG results, the type of movements Howard made, and the observations of the nurses regarding Howard's level of consciousness and responsiveness during the episode, Dr. Faught concluded that Howard did not suffer from epileptic seizures caused by abnormal electrical discharges in the brain. Dr. Faught advised Howard that he did not have epileptic seizures and referred him to a neuropsychologist, Dr. Roy Martin. Dr. Martin examined Howard and reported his impression that Howard probably suffered from conversion disorder.
Dr. Faught testified as an expert witness for Hornady. He stated that he believed to a reasonable degree of medical certainty that Howard's episodes were nonepileptic seizures or pseudoseizures and were very likely the same thing that Howard had experienced since 1967. Dr. Faught further testified that he had reviewed the EEG data recorded during Howard's March 1999 hospitalization and believed that Dr. Gehi erred in concluding that the result was mildly abnormal.
On August 16, 1999, Howard was again hospitalized and diagnosed with nonepileptic seizures and conversion disorder. In early September 1999, Howard was diagnosed with nonepileptic "spells" with no clear etiology. In late September 1999, Howard was referred to another neurologist, Dr. Kenneth Pilgreen, for treatment.
Like Dr. Faught, Dr. Pilgreen conducted extensive tests on Howard, including continuous monitoring via EEG. Dr. Pilgreen, however, concluded that Howard suffered from epileptic seizures located in the left front temporal region of his brain. Dr. Pilgreen based his diagnosis on the results of the EEG test he had performed, on the fact that Howard had responded well to antiseizure medication, and on the fact that Howard had lost consciousness after the 1998 head trauma.
Testifying as Howard's expert witness, Dr. Pilgreen stated that "the most common cause of the seizures, certainly in the adult population, is head trauma" and that "sometimes it's 10 years or 15 years before the first seizure." Dr. Pilgreen testified that he believed to a reasonable degree of medical certainty that the initiating cause of Howard's seizures was the 1998 head trauma.
Dr. Pilgreen acknowledged that no one could say with certainty whether Howard had an episode of paralysis or a seizure in March 1999; however, he testified that he believed the March 1999 episode was the first of Howard's epileptic seizures. Dr. Pilgreen believed that it was more likely that Howard's 1998 head injury caused the seizures than the March 1999 head injury.
According to Dr. Pilgreen, his methods and equipment were superior to those used *Page 475 
by Dr. Faught, particularly because he used 72 electrodes for an EEG test when Dr. Faught used only 21 electrodes. Dr. Faught, in contrast, testified that Dr. Pilgreen's methods were unreliable and frequently suggested abnormalities that did not exist.
Based on the ore tenus and documentary evidence it received, the trial court concluded that the 1998 accident arose out of and in the course of Howard's employment with Hornady. Relying on Dr. Pilgreen's testimony, the trial court concluded that Howard suffered from epileptic seizures and that those seizures were caused by the head injury Howard sustained in the 1998 accident. The trial court further concluded that Howard was permanently and totally disabled and awarded compensation accordingly. Regarding Hornady's argument that Howard had misrepresented his medical history, the trial court found: "The evidence presented at trial proves that Howard disclosed his prior medical condition as he understood that condition to be and consistent with what the evidence in this case proves."
 Standard of Review
Hornady raises the following issues on appeal: (1) whether the trial court lacked subject-matter jurisdiction; (2) whether the trial court erred in failing to apply the misrepresentation defense; (3) whether the trial court erred in finding that the 1998 accident caused Howard's seizures; (4) whether the trial court erred in finding that the seizures arose out of and in the course of Howard's employment; and (5) whether the trial court erred in failing to hold a hearing on Hornady's postjudgment motion. We need only address the first two issues.
In considering those issues, we will apply the following standards:
 "When this court reviews a trial court's factual findings in a workers' compensation case, those findings will not be reversed if they are supported by substantial evidence. § 25-5-81(e)(2), Ala. Code 1975. Substantial evidence is `evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.' West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala. 1989). Further, this court reviews the facts `in the light most favorable to the findings of the trial court.' Whitsett v. BAMSI, Inc., 652 So.2d 287, 290 (Ala.Civ.App. 1994), overruled on other grounds, Ex parte Trinity Indus., Inc., 680 So.2d 262 (Ala. 1996). This court has also concluded: `The [1992 Workers' Compensation] Act did not alter the rule that this court does not weigh the evidence before the trial court.' Edwards v. Jesse Stutts, Inc., 655 So.2d 1012, 1014
(Ala.Civ.App. 1995). However, our review as to purely legal issues is without a presumption of correctness. See Holy Family Catholic School v. Boley, 847 So.2d 371, 374 (Ala.Civ.App. 2002) (citing § 25-5-81(e)(1), Ala. Code 1975)."
Reeves Rubber, Inc. v. Wallace, 912 So.2d 274, 279
(Ala.Civ.App. 2005).
 Subject-Motter Jurisdiction
Regarding subject-matter jurisdiction, Hornady argues for the first time on appeal that because the circuit judge recused himself, he did not have authority to appoint his successor. According to Hornady, because the circuit judge lacked authority to appoint a successor, the district judge never obtained subject-matter jurisdiction over the case, and any judgment entered by him is void. Hornady bases its argument primarily on Ex parte Jim Walter Homes, Inc.,776 So.2d 76 (Ala. 2000). *Page 476 
In Jim Walter Homes, the sole circuit judge for Sumter County recused himself on the defendants' motion because he was personally represented by a member of the law firm that represented the defendants. Pursuant to Rule 13, Ala. R. Jud. Admin., the judge assigned the case to a district judge for Greene County. The defendants objected to the assignment, and the circuit judge entered a second order referring the case to the Administrative Office of Courts for reassignment. Despite the second order, the district judge for Greene County proceeded to hold a hearing in the case. At that hearing, the defendants moved the district judge to recuse himself. Their motion was denied, and the defendants filed a petition for a writ of mandamus with the supreme court. The supreme court stated:
 "[I]n order to avoid the appearance of impropriety, we hold that after a judge presiding in a particular case has been disqualified from hearing that case, under the Canons of Judicial Ethics, either voluntarily or by objection, he or she can take no further action in that case, not even the action of reassigning the case under Rule 13, Ala. R. Jud. Admin."
776 So.2d at 80. Hornady bases its argument on appeal on this language. According to Hornady, the rule regarding assignments established by Jim Walter Homes is jurisdictional in nature and can therefore be raised at any time.
Although the supreme court in Jim Walter Homes did not expressly state whether the rule it announced was jurisdictional or simply procedural in nature, it did make findings regarding whether the defendants had waived their objections to the assignment. The supreme court stated:
 "[T]he [defendants'] delay was mitigated by several factors. First, the [defendants] asked that their cases be sent to the [Administrative Office of Courts] for reassignment when they initially requested that [the circuit judge] disqualify himself. Second, they made their formal objection to [the district judge's] assignment the first time he conducted a proceeding in the case. Finally, and most significantly, [the district judge] had made no ruling on any issue in this case before the [defendants] made their objection on [the day of the hearing]. Therefore, we conclude that the [defendants] did not waive their objection."
776 So.2d at 78-79. Based on this language, we believe that the rule announced in Jim Walter Homes is not jurisdictional and that objections based on it may be waived. This conclusion is also supported by the fact that the court inJim Walter Homes did not overrule an earlier opinion from this court, Edge v. Edge, 494 So.2d 71
(Ala.Civ.App. 1986).
In Edge, the husband in a divorce case made a nearly identical argument to the argument Hornady has made regarding the district judge's assignment. There, the circuit judge for Butler County recused himself under the Alabama Canons of Judicial Ethics, without stating the reasons for his recusal, and appointed the district judge for Butler County as his successor. The husband argued that the circuit judge, after "having recused or disqualified himself, had no authority to appoint a `successor,' the district judge, to preside over the case. Hence, . . . the district judge also lacked authority, and the decree he entered is void or voidable."494 So.2d at 71-72. The husband argued that the issue was "a jurisdictional one and that it, therefore, may be raised for the first time on appeal." Id. at 73. Although it did not reach the issue decided in Jim Walter Homes, this court found specifically that the question was not jurisdictional in nature and that the husband had waived his objection. *Page 477 
 "Rule 13 of the Alabama Rules of Judicial Administration clearly gives the presiding circuit judge the administrative authority to appoint a district judge to sit in a case, such as the present one, in which the presiding circuit judge recuses himself for reasons which do not appear of record. In this instance, therefore, we do not find the issue of the presiding circuit judge's authority to appoint the district judge to be a jurisdictional one capable of being raised for the first time on appeal."
494 So.2d at 72.
Jim Walter Homes did not overrule Edge or announce a contrary rule. It simply distinguished the case on the ground that "the complaining party [in Edge] was held to have waived the objection by failing to raise the issue in the trial court," whereas the petitioners in Jim WalterHomes had not waived their objection. 776 So.2d at 79.
Hornady did not raise any objection to the district judge's assignment until its postjudgment motion. At that time, the district judge had presided over the case for more than five and a half years. He had reviewed and ruled on Hornady's summary-judgment motion, had taken testimony from witnesses for both parties at the final hearing of the case, and had issued a final order in Howard's favor. Only after Hornady received an adverse final judgment did it object to the assignment. The record, therefore, clearly shows that Hornady waived its objection to the assignment. See, e.g., Knight v. NTN-BowerCorp., 607 So.2d 262, 265 (Ala.Civ.App. 1992) ("The employee . . . did not raise the issue of the trial judge's bias until he had received an adverse judgment, failing therefore to afford the judge an opportunity to recuse himself before he heard the case. The disqualification of a trial judge may be waived if the parties proceed to trial without objection." (citing Ross v. Luton, 456 So.2d 249
(Ala. 1984))).
 The Misrepresentation Defense
Hornady argues on appeal that the trial court erred in failing to apply its misrepresentation defense. In 1992, the Alabama Legislature amended § 25-5-51, Ala. Code 1975, to state, in relevant part:
 "No compensation shall be allowed if, at the time of or in the course of entering into employment or at the time of receiving notice of the removal of conditions from a conditional offer of employment, the employee knowingly and falsely misrepresents in writing his or her physical or mental condition and the condition is aggravated or reinjured in an accident arising out of and in the course of his or her employment.
 "At the time an employer makes an unconditional offer of employment or removes conditions previously placed on a conditional offer of employment, the employer shall provide the employee with the following written warning in bold type print, `Misrepresentations as to preexisting physical or mental conditions may void your workers' compensation benefits.' If the employer defends on the ground that the injury arose in any or all of the last above stated ways, the burden of proof shall be on the employer to establish the defense."
Thus, in order to prevail under this section, Hornady was required to prove that (1) in the course of Howard's entering into his employment relationship with Hornady, (2) Hornady provided Howard with the written warning set forth in § 25-5-51, (3) Howard knowingly and falsely misrepresented his physical or mental condition, (4) Howard's misrepresentation was made in writing, and (5) Howard's condition was aggravated or reinjured in an accident arising out of and in the course of his employment. § 25-5-51, Ala. Code 1975. *Page 478 
In determining whether the trial court erred in applying the § 25-5-51 misrepresentation defense, we are mindful of the standard of review set forth above. The evidence presented to the trial court shows that Hornady satisfied the first two elements stated above. Additionally, regarding the fifth element, the trial court expressly found that Howard's 1998 head injury arose out of and in the course of his employment and that it aggravated his preemployment condition. Regarding aggravation, the trial court stated:
 "What is apparent based upon a preponderance of the evidence and by substantial evidence presented at trial is that Howard's pre-employment condition appears to have been made symptomatic and/or has become exacerbated in that, according to Dr. Pilgreen, Howard's feelings of generalized weakness and fatigue now occur following his seizures."
Dr. Pilgreen testified that Howard's seizures "evoked" episodes of periodic paralysis. He also testified that because of the seizures Howard's episodes of paralysis were "more frequent than they've ever been before." Based on this evidence, we believe that the trial court's conclusion was based on substantial evidence and that Hornady satisfied its burden of proof as to the fifth element of the § 25-5-51
misrepresentation defense.
We, therefore, turn our analysis to the third and fourth elements of the defense: whether Howard knowingly and falsely misrepresented his physical or mental condition to Hornady and did so in writing. The evidence showed that in 1968 and in April 1997, Howard received diagnoses of syncope, or fainting. However, the evidence showed that in May 1997, just one year before he applied for employment with Hornady, Howard was hospitalized and diagnosed with "episodic paralysis."
Howard's medical records showed that in 1969, after more extensive testing, four separate Air Force doctors, independent of one another and at different times, diagnosed Howard with recurrent flaccid paralysis. Howard demonstrated his knowledge of those diagnoses when he confirmed at trial that the doctors had called his episodes "paralysis." Furthermore, the documentary evidence showed that Howard had indicated on an Air Force form, which utilized the same format for recording a patient's medical history as Hornady's form, that he had a history of paralysis. The evidence, therefore, clearly shows that Howard knew he had been diagnosed with and had experienced paralysis since 1969.
During the course of his entering into an employment relationship with Hornady, Howard completed and signed a form regarding his medical history. On that form, he was asked to mark "yes" or "no" to indicate whether he had a history of various symptoms, conditions, or diseases. Despite his knowledge that multiple doctors had called his condition "paralysis," and despite the fact that he had marked "yes" to a nearly identical question on an Air Force form in 1969, Howard marked "no" to indicate that he had no history of "paralysis, including polio." Howard also marked "no" to indicate that he had no history of "dizzy spells or fainting." Howard did disclose that he had been hospitalized in 1997; however, he did not state why. Howard also, apparently, orally disclosed his diagnoses of syncope to the physician who examined him in 1998.
Based on the foregoing, we believe that Hornady showed, by substantial evidence, that Howard knowingly and falsely misrepresented his physical condition, i.e., his history of paralysis, to Hornady in writing and that the trial court's conclusion that Howard disclosed his condition as he understood *Page 479 
it is not supported by substantial evidence. Accordingly, we believe that Hornady satisfied its burden of proof as to each of the elements of the § 25-5-51 misrepresentation defense.
We note that the trial court based its conclusion, in part, on Hornady's failure to investigate Howard's 1997 hospitalization and his oral disclosure of his prior diagnosis of syncope. However, given that Howard had indicated on the health history form that he had no history of paralysis, or a number of other serious conditions, we believe it would be unreasonable, under the circumstances of this case, to charge Hornady with a duty to investigate for such conditions.
Based on the foregoing, we reverse the trial court's judgment and remand the cause for the entry of a judgment consistent with this opinion. In light of this decision, we need not address the other issues that Hornady raises on appeal.
REVERSED AND REMANDED WITH INSTRUCTIONS.
PITTMAN, BRYAN, and THOMAS, JJ., concur.
MOORE, J., recuses himself.
[1] The trial court received testimony indicating that syncope is the medical term for fainting, a loss of consciousness.
[2] The trial court received testimony that flaccid paralysis is a type of paralysis where the limbs are limp.
[3] We understand that the videotape is either lost or no longer exists.