THOMAS, Judge.
In August 2006, Claiborne Johnston began working for G.A. West & Co., Inc. (“G.A. West”). When Johnston applied for a position with G.A. West, he was required to fill out a medical questionnaire. That questionnaire contained the following questions:
“Have you had any injury or injuries on the job?
“Do you have or have you had other injuries or illnesses not on the job (home, auto, sports, hunting, etc.) that have resulted in hospitalization, surgery, or lost work time?
“Are you taking any long term (more than 30 days) prescribed medication?
“Do you have or have you had diagnosed as having [sic] any illnesses or injury for which you are seeking treatment?”
Johnston answered “no” to all the questions except the first one. He disclosed in response to the first question that he had been injured on April 10, 2005, when he fell on a jack stand while employed by Pipeline Technic, LLC (“PTL”). Johnston further explained that he had injured his coccyx, that he had filed a workers’ compensation claim regarding the injury, and that he had been assigned a 5% disability rating as a result of the injury. It is *77 undisputed that Johnston did not reveal that he had been prescribed Mobic, an anti-inflammatory medication, as a result of his injury. Johnston also admittedly failed to reveal that he had had hip-replacement surgeries in 2002 and 2005.
On or about September 14, 2006, Johnston was working on a job at which G.A. West had been contracted to put in a reinforced-eoncrete driveway at a power plant. While preparing the site, another employee was excavating a ditch; in doing so, that employee damaged a buried water pipe with a baekhoe. Johnston, Dale Clements, Johnston’s supervisor, and another employee climbed into the ditch to examine the damage to the water pipe. Johnston was either stepping to the other side of the ditch or stepping down into the ditch when he either lost his balance or slipped on the water pipe and began to fall; Johnston was able to right himself before falling, but, as he did so, he felt excruciating pain in his lower back, through his hips, and radiating into his thighs. Johnston testified that he recalled immediately hollering that he had hurt himself; however, because Johnston had undergone hip-replacement surgeries in 2002 and in 2005, he said that he had initially believed, and had initially told Clements, that he had injured his hips when he slipped. Johnston explained that he had “just tried to walk a little bit, you know, stretch, try to get through the pain” and that he had then told Clements that he was “okay.” Johnston finished his shift that day. According to Johnston, he was from “the old school,” which meant that “you just kind of grit your teeth and go.”
Clements recalled that Johnston had tried to step across the ditch and had instead stepped back into the middle of the ditch; according to Clements, Johnston had stated “that hurt” and placed his hand on his hip. Clements also recalled Johnston explaining that he “knew better than to take awkward steps” because “he could tear all this [i.e., his hip replacements] loose.” Clements said that he had asked Johnston if he was okay and that Johnston had said that he was “okay now” and that Johnston had finished the rest of the day at work.
According to Johnston, the incident occurred on a Thursday, and, because he was working 10-hour shifts Monday through Thursday, he went home and spent the 3-day weekend suffering pain in his lower back, in his hips, and down his legs. When he returned to work on Monday, Johnston said, he reported to Clements that he was still suffering pain from the incident on Thursday and that he thought he needed to see a doctor. Johnston testified that Clements had “immediately looked at me and kind of shuffled off, went off, you know.” Based on Clements’s response, Johnston said, he called the doctor who had performed his hip-replacement surgeries, Dr. William J. Bose, and scheduled an appointment for Tuesday, September 19, 2006. Johnston testified that he told Clements that he had made the appointment and that Clements had said “okay.” After Dr. Bose determined that Johnston had not injured his hips, Dr. Bose referred Johnston to Dr. James West; Johnston said that he informed Clements that Dr. Bose was sending him to see Dr. West because Dr. Bose suspected that Johnston had suffered a back injury. Johnston testified that Clements made no response to that information.
Johnston admitted that he did not report his injury to people in the office of G.A. West in September 2006 and that he did not file a workers’ compensation claim at that time. According to Johnston, he did not think that the injury, which he first thought was to his hips, was G.A. West’s responsibility. Furthermore, Johnston ex *78 plained, he had not realized that slipping on a pipe could cause much damage. He also testified that he had been “brought up” to tough it out and not to file injury claims; he said he wanted to protect his reputation as a good worker.
On September 16, 2007, one year after his injury, Johnston went to the office of G.A. West’s company nurse, Darlene Arnold. On that date, Johnston told Arnold that he had suffered an injury while working for G.A. West in September 2006. Johnston explained to Arnold that he had at first thought that his injury was related to his hips or his coccyx but that he had since learned otherwise. He told her that he had hoped that G.A. West might consider paying for his treatment, because his previous employer, PTL, had stopped paying for his treatment after it discovered that he had injured his back.
As noted above, Johnston initially sought treatment from Dr. Bose, who then referred Johnston to Dr. West. Dr. West had treated Johnston for his fractured coccyx. Dr. West testified by deposition. He explained that Johnston’s 2005 injury that occurred while Johnston was working for PTL (“the 2005 PTL injury”) resulted from a fall onto a jack stand. According to Dr. West, Johnston suffered a sacral coc-cygeal segment fracture in that accident. An MRI performed in 2005, after Johnston had suffered the 2005 PTL injury, revealed significant degenerative changes in the lumbar region of Johnston’s back, including some mild bulging disks causing mild nerve-root pressure, mostly at the L4-L5 and L5-S1 levels. Dr. West testified that, in January 2006, another MRI performed on Johnston revealed that his fractured coccyx was still symptomatic; ultimately, Dr. West assigned Johnston a 5% physical-disability rating for the fractured coccyx, and he opined that the long-term effects of the fracture could include difficulty sitting for long periods and that flare-ups of pain in the area were likely. Dr. West explained that, although Johnston had made complaints of lower-back pain during the treatment of his fractured coccyx, “by far the chief complaint” lodged by Johnston during that treatment was sacral pain and that his complaints before September 2006 were thus related to his fractured coccyx.
When Dr. West saw Johnston after the 2006 incident, however, Dr. West noted that Johnston’s complaints were directly related to his lumbar region. Johnston had another diagnostic MRI in 2006, which revealed a “significant herniation” of the disk at L4-L5 and a central annular tear at L3-L4. Dr. West specifically testified that Johnston “appeared to complain to me of two separate pain patterns, each of which was assigned to specific injuries,” i.e., the fractured coccyx and the herniated disk. Dr. West indicated that, although the 2005 MRI and the second 2006 MRI both revealed degenerative changes in Johnston’s back, the second 2006 MRI significantly differed from the 2005 MRI because it showed a large disk herniation. The disk herniation, Dr. West testified, would leave Johnston unable to do heavy lifting, bending, and twisting — activities that were required of Johnston by his former employers, including G.A. West. Dr. West had not recommended that Johnston undergo surgery because, at the time Dr. West last saw him, Johnston was still able to handle his pain. Dr. West noted that Johnston had exhibited a high pain threshold and that Johnston was motivated to return to work.
Johnston testified that he had left G.A. West’s employ on or about September 24, 2006, after he could no longer work due to the pain he was suffering. He explained that he told Clements that he could not continue working because the pain was *79 “too much.” Johnston did not work for approximately one year after he quit his job at G.A. West.
However, Johnston testified that he again sought work in October 2007. He worked for Burke’s Mechanical, Inc., for six weeks in October and November 2007 driving a forklift; Johnston testified that he was required to lift materials in that job and that he had had difficulty and had experienced pain in his lower back, through his hips, and into his thighs that worsened when he would bend and lift. Johnston next worked at a landfill in Mobile in December 2007 for a three-week period operating a trackhoe. According to Johnston, the landfill job was intended to be temporary, and he suffered discomfort while performing the landfill job because he would get stiff when he had to sit for long periods. Johnston next worked at the Barry Steam Plant for three months— January through March 2008 — operating a forklift; he again complained that that job was difficult to perform due to the lifting and bending associated with it. Johnston last worked for three days in April 2008 at IPSCO Steel, during a shutdown; at that time, Johnston ran an excavator. He explained that each of the jobs he had had since he left G.A. West were unlike the jobs he had had throughout most of his career, because the jobs he had held since the 2006 accident were primarily equipment-operator jobs and those he had held before his accident were typically civil-foreman jobs, a job that he described as “hard, labor-intensive work.”
Lloyd Casey Dugas, Jr., was Johnston’s foreman in April 2008 at the IPSCO Steele job. Dugas testified that he had worked with Johnston before in either 2000 or 2001 for approximately a year and that he had found him to be a good foreman and that he had exhibited a good work ethic. Dugas said that Johnston had performed his job at IPSCO Steel and that Johnston had not appeared to be suffering from any physical difficulties. According to Dugas, he would not recommend that someone with a “bad back” seek employment in the construction industry.
Johnston testified at trial that he did not think that he could maintain gainful employment. Although he had worked in 2007 and in 2008, Johnston said that his back was getting “worser and worser.” Johnston admitted that he had planted gardens since the accident, but he said that he no longer picked the fruits or vegetables he grew, stating that he could not do it anymore. In fact, Johnston recounted that he had hurt his back one day while moving a row planter in the bed of his truck. Johnston said that he could no longer ride horses, a pastime that he had enjoyed with his son; he said that he had sold his horses the summer of the trial. However, Johnston admitted that he had only recently recovered from a four-wheeler accident at the time of trial; he said that he had hit a fallen log while driving the vehicle to a relative’s home and that he had broken his collarbone and shoulder bone, had suffered 12 fractures in his ribs, and had punctured a lung.
According to Johnston, he had good days and bad days. He said that on some mornings he would be so stiff when he got out of bed that he was unable to do much but sit or lie around the house. However, Johnston said that he did not like just lying around, so he would often do as much as he was able to do, including “piddling” around the house or working in his garden. He said that, as a single man, he handled his own household chores, like sweeping and mopping; he said that those chores often caused him pain and caused him to have to sit or lie down to rest afterwards. Johnston explained that he could not sit down for a long period before needing to *80 move around and that he could not stand for a long period without needing to sit down.
Johnston admitted that he had not revealed his work-related injuries to his coccyx or his back to any of his employers since G.A. West. Johnston explained that he had omitted the information from his applications because he had needed the work to provide child support for his son and that he had known that if he revealed his injuries he would not have been hired. He further admitted that he had represented on his application for unemployment benefits, which he had filed in May 2008, that he was ready, willing, and able to work and that he was neither seeking nor receiving workers’ compensation benefits.
Johnston testified that he does not sleep very well. He explained that some nights he would manage to get to sleep around 10 p.m. but that he would awaken around midnight and remain awake for an hour or two before falling back to sleep for a few hours. He said that on other nights he was able to sleep from around 10 p.m. to 3 a.m. but that once he awoke at around 3 a.m. he would just get up for the day. As a result of his interrupted sleep patterns, Johnston explained, he often took naps during the day.
Johnston testified that he regularly took Mobic, a prescribed anti-inflammatory medication, which he said sometimes bothered his stomach. He said that he takes over-the-counter pain relievers like Motrin and, more often, Advil, daily to cope with pain caused by his activities. Johnston testified that he had been prescribed something he called Amneal, which is not a drug but is instead a pharmaceutical manufacturer; Johnston said that he thought that that drug was a narcotic pain reliever and that he did not take it often. When Johnston did take the narcotic pain reliever, he said, it was because he needed relief after working in the garden or around the house; he said that he took only half of one pill when he did take it.
After a trial in August 2010, the trial court entered a judgment finding Johnston permanently and totally disabled and awarding benefits to him “for the remainder of his life.” G.A. West appeals the trial court’s judgment.[1] G.A. West argues first and foremost that Johnston’s failure to reveal on his medical questionnaire that he had had hip-replacement surgeries, that he had been prescribed Mobic, and that he had had back problems amounted to misrepresentations of his physical condition and, therefore, that, under Ala.Code 1975, § 25-5-51, his claim for workers’ compensation benefits is barred.[2] G.A. West fur *81 ther argues that Johnston did not give proper notice of his injury; that Johnston concealed the work-related nature of his injury, thus barring his claim for benefits; that the evidence does not support the conclusion that Johnston is permanently and totally disabled; that Johnston did not establish medical causation of his injury; that Johnston failed to establish the reasonableness of his medical expenses; and that the trial court erred by awarding Johnston compensation “for the remainder of his life.”
Johnston concedes that the trial court erred insofar as it awarded him compensation for the remainder of his life instead of for the period of his permanent total disability, and we reverse the judgment insofar as it contains that language. See Ala. Code 1975, § 25-5-57(a)(4)a. (providing that compensation for permanent and total disability is “during the permanent total disability”); see also Dolgencorp, Inc. v. Hudson, 924 So.2d 727, 736-37 (Ala.Civ. App.2005); and Bostrom Seating, Inc. v. Adderhold, 852 So.2d 784, 796 (Ala.Civ.App.2002). However, after a review of the evidence presented at trial and the arguments presented, we affirm the judgment of the trial court insofar as it concluded that Johnston was entitled to workers’ compensation benefits for permanent and total disability and awarded those benefits.
Our review of this case is governed by the Workers’ Compensation Act, § 25-5-1 et seq., Ala.Code 1975, which states in pertinent part: “In reviewing pure findings of fact, the finding of the circuit court shall not be reversed if that finding is supported by substantial evidence.” Ala. Code 1975, § 25-5-81(e)(2). Therefore, this court “will view the facts in the light most favorable to the findings of the trial court.” Whitsett v. BAMSI, Inc., 652 So.2d 287, 290 (Ala.Civ.App.1994), overruled on other grounds, Ex parte Trinity Indus., Inc., 680 So.2d 262, 269 (Ala.1996). Further, a trial court’s finding of fact is supported by substantial evidence if it is “supported by ‘evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.’ ” Ex parte Trinity Indus., 680 So.2d at 269 (quoting West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989), and citing Ala. Code 1975, § 12-21-12(d)). Our review of legal issues is without a presumption of correctness. Ala.Code 1975; § 25-5-81(e)(1); see also Ex parte Trinity Indus., 680 So.2d at 268.
G.A. West argues that Johnston failed to reveal his hip-replacement surgeries, his prescription-medication usage, and his alleged “history of back problems” on *82 the medical-questionnaire portion of his employment application. Based on this fact, G.A. West contends, Johnston is barred from receiving workers’ compensation benefits by Ala.Code 1975, § 25-5-51, which provides, in pertinent part, that
“[n]o compensation shall be allowed if, at the time of or in the course of entering into employment ..., the employee knowingly and falsely misrepresents in writing his or her physical or mental condition and the condition is aggravated or reinjured in an accident arising out of and in the course of his or her employment.”
As noted above, Johnston admits that he did not list his hip-replacement surgeries or his Mobic prescription on the medical questionnaire. However, those admitted omissions do not, in and of themselves, result in an automatic bar to Johnston’s receipt of workers’ compensation benefits. Furthermore, G.A. West contends that Johnston also failed to list what G.A. West describes as a medical history of serious back problems that began as early as 1995.
According to G.A. West, Johnston’s medical records reveal that he complained of pain in his back in 1995 when he reported that he had injured himself while moving a trailer, in 1998 and 1999 in. conjunction with pain in his right hip and thigh, and again in 2005 when he suffered the coccyx fracture while working' for PTL. Indeed, the record reflects those complaints over Johnston’s 20-year work history. In addition, Johnston’s medical records reveal that an X-ray taken in 1998 indicated that Johnston suffered from lumbar scoliosis and had significant disk-space narrowing at L5-S1, and the 2005 MRI revealed several significant degenerative changes in Johnston’s back, including mildly bulging disks at the L4-L5 and L5-S1 levels, the aforementioned scoliosis, and what Dr. West characterized as some mild pressure on nerve roots.
We must consider several factors before we can determine whether Johnston’s failure to list his hip-replacement surgeries, his Mobic prescription, and his alleged “history of back problems” on the medical questionnaire will serve as a bar to compensation. Hornady Truck Lines, Inc. v. Howard, 985 So.2d 469, 478 (Ala.Civ.App. 2007).
“[I]n order to prevail under this section, [G.A. West] was required to prove that (1) in the course of [Johnston’s] entering into his employment relationship with [G.A. West], (2) [G.A. West] provided [Johnston] with the written warning set forth in § 25-5-51, (3) [Johnston] knowingly and falsely misrepresented his physical or mental condition, (4) [Johnston’s] misrepresentation was made in writing, and (5) [Johnston’s] condition was aggravated or reinjured in an accident arising out of and in the course of his employment.”
Hornady Truck Lines, 985 So.2d at 477; Cascaden v. Winn-Dixie Montgomery, LLC, 81 So.3d 1273, 1276-77 (Ala.Civ.App.2011).
G.A. West complains vehemently that it was not given notice that Johnston had suffered from back injuries for years and that he is therefore barred by the application of § 25-5-51 from receiving workers’ compensation benefits. According to G.A. West, Johnston should have reported every single time he felt pain in his back regardless of whether the pain was significant or whether it had resolved with no further incident. Although the medical records indicate that Johnston had suffered some problems with his back, a review of the medical records reveals that some of Johnston’s earlier back problems were related to his severe hip problems and that Johnston stopped reporting back *83 pain after each of his hip replacements. Other than a reference to a potential need for an epidural block, which apparently was never performed, for treatment of Johnston’s back pain in 1998, the medical records do not indicate that Johnston was ever informed that he had any serious back-related injury or illness. The only definitive diagnosis that Johnston appeared to have received regarding his 2005 PTL injury was that he had suffered a coccyx fracture, so he could not have knowingly or willfully failed to report a diagnosis he had not received.
Johnston worked in a labor-intensive field from 1986 to 2006. After each episode of back pain and after each hip-replacement surgery, Johnston returned to work, resuming his labor-intensive jobs without apparent incident. Dr. West testified that Johnston’s back, although clearly experiencing degenerative changes, was in a condition expected of many 50-year-old, hard-working men like Johnston. In addition, Johnston’s testimony and the testimony of Clements and of Dugas, who both supervised Johnston, reveals that Johnston was a hard-working employee and that he had an exemplary work ethic; this could not be so if Johnston’s back had been routinely symptomatic. The medical records do not reveal that Johnston ever received any actual diagnosis that he suffered from a bulging disk or that he actually received any significant treatment for any back injury or condition. We cannot conclude that Johnston’s failure to note that he made several complaints of back pain over a 20-year period amounted to Johnston’s “knowingly and falsely misrepresenting] his physical ... condition,” Hornady Truck Lines, 985 So.2d at 477, on his medical questionnaire such that he should be denied workers’ compensation benefits under § 25-5-51.
Regarding Johnston’s failure to reveal his use of prescription medication and his hip-replacement surgeries, we reach the same conclusion but for a different reason. No evidence in the record satisfies G.A. West’s burden of demonstrating a causal connection between these misrepresentations and the back injury that Johnston suffered. See Hornady Truck Lines, 985 So.2d at 478; see also B E & K, Inc. v. Weaver, 801 So.2d 12, 19 (Ala.Civ.App.2000). To demonstrate a causal connection, G.A. West was required to show:
“(1) that the employee’s disability resulted from a reasonably foreseeable accident or job-related activity that in and of itself, in the absence of a preexisting condition, would not have caused the employee to become disabled, and (2) that the employee’s preexisting condition substantially increased the risk that the employee would become disabled from a reasonably foreseeable accident or job-related activity.”
Weaver, 801 So.2d at 19.
Although Johnston first believed that he had injured his hips when he slipped on the pipe, his injury was actually a herniation of a disk in his back. Nothing in Dr. West’s testimony or in any other testimony or documentary evidence indicates that Johnston’s hip replacements substantially increased the risk that Johnston would become disabled as a result of the September 2006 accident. Likewise, no evidence indicates that Johnston’s use of the prescription medication Mobic, if he was even taking the medication at the time, substantially increased the likelihood that Johnston would become disabled as a result of the September 2006 accident. Thus, we cannot agree with G.A. West that the trial court erred by failing to conclude that Johnston’s failure to reveal his hip-replacement surgeries and his prescription-medi *84 cation usage should bar Johnston from receiving benefits under § 25-5-51.
G.A. West also contests the trial court’s conclusion that Johnston gave proper notice of his injury. Although it is undisputed that Johnston did not give written notice of his injury to G.A. West, “[wjritten notice is not required where it is shown that the employer had actual notice of the injury.” James v. Hornady Truck Line, Inc., 601 So.2d 1059, 1061 (Ala.Civ.App.1992); see also Ex parte Singleton, 6 So.Sd 515, 519 (Ala.2008). As we explained in James,
“[ojral notice is sufficient to give the employer actual notice. The employer must also be notified that the employee was injured ... while in the scope of his employment. ‘If, however, the employer has some information connecting work activity with an injury, it may be put on reasonable notice to investigate further.’ ”
James, 601 So.2d at 1061 (quoting Russell Coal Co. v. Williams, 550 So.2d 1007, 1012 (Ala.Civ.App.1989)) (citations omitted). “Knowledge on the part of a supervisory or representative , agent of the employer that a work-related injury has occurred will generally be imputed to the employer.” Wal-Mart Stores, Inc. v. Elliott, 650 So.2d 906, 908 (Ala.Civ.App.1994).
G.A. West argues that the trial court did not have substantial evidence from which it could have concluded that G.A. West had actual notice of Johnston’s injury. Specifically, G.A. West contends that the situation in the present case is similar to the situation found insufficient to impart notice in United Auto Workers Local 1155 v. Fortenberry, 926 So.2d 356 (Ala.Civ.App.2005), and that the statements Johnston made to Clements are like the statements found insufficient to impart notice in Premdor Corp. v. Jones, 880 So.2d 1148 (Ala.Civ.App.2003). We cannot agree that the present case is equivalent to either Fortenberry or Jones.
In Fortenberry, this court reversed a trial court’s judgment awarding Forten-berry workers’ compensation benefits for a stroke he suffered on the premises of his employer. Fortenberry, 926 So.2d at 360. Although the trial court had concluded that the employer had notice of Fortenber-ry’s stroke because he suffered it on the premises and he was observed by the employer’s financial secretary, we concluded otherwise, noting that the fact that the stroke occurred on the premises did not place the employer on notice that the stroke had occurred as a result of Forten-berry’s work activities. Id. Although we see the parallel between the fact that the financial secretary in Fortenberry witnessed Fortenberry suffering from the effects of his stroke and Clements’s seeing Johnston slip and grab his hip in pain, we believe the similarity of the two cases ends there. A stroke, by its nature, can occur at any time and at any place, and the financial secretary in Fortenberry did not witness Fortenberry engaging in any work task that might have been the cause of the stroke. Clements, however, did witness Johnston slip on the pipe they were inspecting and immediately complain of pain caused by that activity.
In Jones, we also reversed a trial court’s award of workers’ compensation benefits because we found insufficient evidence indicating that the employer had been given proper oral notice that Jones’s back injury was related to her employment. Jones, 880 So.2d at 1155. Jones’s statements to her supervisor and to the plant manager that she “did something to her back” and that her back hurt did not apprise either the plant manager or Jones’s supervisor that she had injured her back while performing her work duties. Id. at 1154-55. We explained that
*85 “ ‘[t]he fact that an employer is aware that an employee has pain or [suffers from] a medical problem is not, by itself, sufficient to charge the employer with actual knowledge.’ Russell Coal Co. [v. Williams ], 550 So.2d [1007,] 1012 [ (Ala.Civ.App.1989) ]. The employer must be notified that the employee was injured in the course of her employment. E.g., Ex parte Brown & Root, Inc., 726 So.2d 601 [ (Ala.1998) ]; Russell Coal Co., 550 So.2d [at 1012-13]; Bethea v. Bruno’s, Inc., 741 So.2d [1090,] 1092 [ (Ala.Civ.App.1999) ]. By failing to inform Premdor that she injured her back while at work, Jones failed to comply with the notice requirement of the Workers’ Compensation Act.”
Id. at 1155.
As was the case with Fortenberry, we can see the reason that G.A. West relies on Jones. Johnston’s statements to Clements that he had hurt himself and that he thought he had hurt his hip are similar to Jones’s statements that she “did something to her back” and that her back hurt. Id. at 1154. However, although, like Jones, Johnston stated rather generally that he was hurt without specifically stating that he had just been injured at work, as we noted above, Clements witnessed the work-related activity that prompted Johnston’s exclamation of pain.
All that is required for oral notice to be effective is that it apprise the employer, or its representative, that the injured employee was injured in a work-related accident. James, 601 So.2d at 1061. In fact, oral notice may be sufficient “[i]f ... the employer has some information connecting work activity with an injury, [because] it may be put on reasonable notice to investigate further.” Russell Coal Co. v. Williams, 550 So.2d 1007, 1012 (Ala.Civ.App.1989). Because the evidence supports the conclusion that Clements witnessed Johnston slip on the pipe and heard him exclaim that he was hurt, the trial court’s conclusion that G.A. West had notice of Johnston’s injury through Clements is supported by substantial evidence.
As a companion argument to its notice argument, G.A. West argues that Johnston concealed his work-related injury from G.A. West. G.A. West argues that Johnston’s deliberate concealment of his injury estops him from receiving workers’ compensation benefits. See Mid-South Elec. Co. v. Jones, 848 So.2d 998 (Ala.Civ. App.2002) (Per Pittman, J., with three judges concurring in the result) (acknowledging the defense of “deliberate concealment”); see also BE & K Constr. Co. v. Reeves, 898 So.2d 738 (Ala.Civ.App.2004) (discussing and distinguishing Mid-South Electric). However, our review of the record reveals that G.A. West did not advance that argument before the trial court; its failure to do so precludes our consideration of the issue on appeal. See Dueitt v. Scott Paper Co., 695 So.2d 40, 44 (Ala.Civ.App.1996) (“It is well settled that an appellate court will not consider an issue that has not been properly raised in the trial court.”).
We turn now to G.A. West’s argument that the evidence does not support the trial court’s determination that Johnston is permanently and totally disabled.
“With regard to determining whether an employee is permanently and totally disabled, this court has stated:
“ ‘ “The test for total and permanent disability is the inability to perform one’s trade and the inability to find gainful employment.” Fuqua v. City of Fairhope, 628 So.2d 758, 759 (Ala.Civ.App.1993). See also Liberty Trousers v. King, 627 So.2d 422, 424 (Ala.Civ.App.1993). A “permanent total disability” is defined as including *86 “any physical injury or mental impairment resulting from an accident, which injury or impairment permanently and totally incapacitates the employee from working at and being retrained for gainful employment.” § 25-5-57(a)(4)d., Ala.Code 1975; Russell v. Beech Aerospace Services, Inc., 598 So.2d 991, 992 (Ala.Civ.App.1992).’
“Alabama Catfish, Inc. v. James, 669 So.2d 917, 918 (Ala.Civ.App.1995). See also Boyd Bros. Transp., Inc. v. Asmus, 540 So.2d 757, 759 (Ala.Civ.App.1988) (stating that § 25-5-57(a)(4)d., Ala.Code 1975, ‘requires that the employee be unable to perform his trade or unable to obtain reasonably gainful employment’).”
CVS Corp. v. Smith, 981 So.2d 1128, 1136 (Ala.Civ.App.2007).
G.A. West argues that Johnston’s employment at various places after his injury proves that he is “undeniably capable of working” and that Dr. West did not testify that Johnston was incapable of working, although G.A. West admits that Dr. West did restrict Johnston to working in the light to medium job categories instead of the heavy job category. Indeed, Dr. West did not testify that Johnston was incapable of working and, in fact, testified that Johnston had been motivated to go back to work. Dr. West’s medical-treatment notes indicate that Dr. West thought that Johnston’s plan to find work as an equipment operator was a good idea.
However, Johnston himself testified that some of the equipment-operator jobs required bending and lifting, both activities that Dr. West indicated would be difficult for Johnston. Johnston said that, when he had worked, he had worked in pain because of the bending and lifting or because of having to sit for long periods on the equipment. Johnston explained that his back had worsened over time and that it continued to worsen. He testified that he had trouble sleeping and that he would take naps during the day.
G.A. West specifically challenges whether the trial court could have properly implicitly found[3] that Johnston was incapable of being retrained for gainful employment other than working in the construction industry. G.A. West focuses on Johnston’s “substantial supervisory experience” in making this argument. Although the record does reflect that Johnston had substantial experience as a foreman or a supervisor in the construction or contracting industry, we find G.A. West’s implication that such positions are not as labor-intensive as the positions held by those employees such foremen would supervise to be unsupported by the evidence. To the contrary, the testimony at trial established that a foreman or a supervisor participates in the work being done alongside the crew, which means that Johnston, when working as a foreman, was required to lift, bend, and twist just like every other person hired on the construction crew. Both Clements and Dugas made comments regarding the type of work that the job entailed and neither man indicated that his status as a foreman or a supervisor permitted him to sit idly by as his crew performed the heavy labor. We thus re *87 ject any contention that Johnston’s injury and its resulting restrictions would not prevent him from continuing to perform duties as a supervisor or as a foreman for G.A. West or comparable employers.[4]
Johnston’s supervisory experience and the fact that he holds a commercial driver’s license, G.A. West urges, provides a basis for a determination that retraining Johnston is feasible. However, as we will explain in more detail below, Johnston’s testimony regarding his limitations, including his need for naps during the day, his need to change positions at times, and the fact that on some days he cannot manage to be active at all because of back pain and stiffness, support the conclusion that Johnston cannot be retrained for gainful employment because he will be unable to meet the requirements of being consistently available to work on a daily basis for a sustained period. Furthermore, “gainful employment” is not any and all employment. Although it could be argued that Johnston could probably maintain some form of employment, “gainful employment” has been defined as “employment similar in remuneration to that earned pri- or to the injury.” Ex parte Beaver Valley Corp., 477 So.2d 408, 412 (Ala.1985). We cannot agree with G.A. West that the trial court could not have implicitly concluded that Johnston was not a suitable candidate for retraining. See Werner Co. v. Davidson, 986 So.2d 455, 463 (Ala.Civ.App.2007) (affirming a trial court’s conclusion that an employee was unable to maintain gainful employment and not suitable for retraining based, in part, on evidence that the employee’s “pain prevented] him from normally sleeping, standing, sitting, walking, or laying down for prolonged periods”).
Johnston did testify that he continued, when he could, to be as active as possible, because he did not like lying around. He had injured himself in a four-wheeler accident while driving to a relative’s house in the months before trial, and he testified that he continued to plant gardens, although he testified that he could no longer pick what he planted. However, an employee need not be totally helpless to be permanently and totally disabled. Caseco, LLC v. Dingman, 65 So.3d 909, 925 (Ala.Civ.App.2010). A trial court is free to consider the totality of the evidence, including the employee’s subjective complaints of pain, in making its disability determination. Dingman, 65 So.3d at 925.
Johnston’s testimony reflected that he had good days and bad days but that he did not think that he would be able to work an 8-hour day, 5 days a week, for 52 weeks. Johnston has a 10th-grade education, and he has worked in labor-intensive jobs his entire life. Dr. West testified that Johnston had been motivated to return to work and that he could not resume work requiring lifting, bending, and twisting. Dr. West’s January 2007 medical-treatment note indicates that Dr. West considered Johnston’s plan to seek a less labor-intensive position as an equipment operator reasonable; however, it is noteworthy that the same note indicates that Johnston’s pain symptoms were improved at that time as a result of an epidural block administered in December 2006. Dr. West’s medical-treatment note for Au *88 gust 2007 indicates that a July 2007 epidural block had not provided Johnston significant pain relief. Thus, considering all the evidence and giving weight, as the trial court did, to Johnston’s complaints of pain and his description of the limitations the injury has placed on his activities, we conclude that the trial court’s determination that Johnston is permanently and totally disabled as a result of his September 2006 injury is supported by substantial evidence.
G.A. West next argues that “the trial court erred when it failed to allocate even a portion of [Johnston’s] alleged disability to his previous injuries pursuant to Ala.Code 1975, § 25-5-58.” As Johnston points out, Alabama courts have not applied § 25-5-58 in the manner suggested by G.A. West.
“In a long line of cases beginning with Ingalls Shipbuilding Corp. v. Cahela, 251 Ala. 163, 36 So.2d 513 (1948) (superseded on other grounds by statute, see Tit. 26, § 262(a), Ala.Code 1940), Alabama appellate courts have held that ‘ “the term ... infirmity in [§ 25-5-58] refer[s] to a condition which affects [the plaintiffs] ability to work as a normal man at the time of the accident or which would probably so affect him within the compensable period.” ’ Ex parte Lewis, 469 So.2d 599, 601 (Ala.1985) (quoting Cahela, 251 Ala. at 173, 36 So.2d at 521). Pursuant to Cahela,
“‘the law presumes that there is no preexisting injury or infirmity when the employee is able to fully perform his or her job duties in a normal manner prior to the subject injury. [Section 25-5-58] only applies when the previous injury or infirmity has demonstrated itself as disabling and prevented the employee from earning wages in a normal manner.’
“1 Terry A. Moore, Alabama Workers’ Compensation § 16.25 at 708-09 (1998) (emphasis added; footnote omitted).”
Francis Powell Enters., Inc. v. Andrews, 21 So.3d 726, 736 (Ala.Civ.App.2009). Thus, we will not reverse the trial court’s judgment because of that court’s failure to apportion Johnston’s disability among his injuries.
G.A. West further argues that Johnston failed to establish medical causation of his injury.
“ ‘[F]or an injury to be compensable under the Workers’ Compensation Act, the employee must establish both legal and medical causation.’ Ex parte Moncrief, 627 So.2d 385, 388 (Ala.1993). ‘Once legal causation has been established, i.e., that an accident arose out of, and in the course of employment, medical causation must be established, i.e., that the accident caused the injury for which recovery is sought.’ Hammons v. Roses Stores, Inc., 547 So.2d 883, 885 (Ala.Civ.App.1989).”
Ex parte Southern Energy Homes, Inc., 873 So.2d 1116, 1121 (Ala.2003). As our supreme court further stated in Ex parte Price, 555 So.2d 1060, 1063 (Ala.1989), “lay testimony may combine with medical testimony to supply th[e] requisite proof [of medical causation]; and ... medical testimony, when viewed in light of lay evidence, may amply support the medical causation element without the expert witness’s employing any requisite language.” See also Swift Lumber, Inc. v. Ramer, 875 So.2d 1200, 1203-04 (Ala.Civ.App.2003).
G.A. West contends that the only medical evidence to establish medical causation was provided by the deposition testimony of Dr. West, who, according to G.A. West, “could not state with any certainty” that Johnston’s herniated disk was caused by his accident in September 2006. As our supreme court has aptly explained, medical *89 causation is not determined based on the isolated phrases of medical professionals, “[i]t is in the overall substance and effect of the whole of the evidence, when viewed in the full context of all the lay and expert evidence, and not in the witness’s use of any magical words or phrases, that the test finds its application.” Ex parte Price, 555 So.2d at 1063. Although Dr. West did testify that Johnston’s injuries were “potentially compatible” with an accident like the one Johnston suffered, Dr. West’s other testimony and his medical-treatment notes suggest that Dr. West considered Johnston’s September 2006 work-related accident to be the cause of his herniated disk. Dr. West’s testimony and medical-treatment notes, coupled with Johnston’s own testimony regarding his accident and injury, constitutes substantial evidence supporting the trial court’s conclusion that Johnston proved medical causation of his September 2006 injury. See Francis Powell Enters., 21 So.3d at 735 (affirming a trial court’s award of benefits based on the “ ‘overall substance’ ” of a physician’s testimony (quoting Ex parte Price, 555 So.2d at 1063)).
Finally, G.A. West complains that the record is devoid of evidence of the reasonableness of Johnston’s medical expenses. According to G.A. West, the lack of the evidence of reasonableness of Johnston’s medical expenses provides a basis for reversal of the judgment awarding those expenses. See Williams, 550 So.2d at 1013-14 (“Where there is no evidence that a medical charge is reasonable, there is no basis for awarding a judgment on the charge in a workmen’s compensation case.”). However, the rule in Williams applied to those cases governed by the Workmen’s Compensation Act before it was amended in 1992. The 1992 amendments, among other things, “instituted dramatic changes in the medical benefits statute regarding the maximum amount that can be charged for medical services.” 2 Terry A. Moore, Alabama Workers’ Compensation § 17.9 at 20 (1998). The Workers’ Compensation Act now limits the amount an employer is liable for a medical expense to the prevailing rate or the maximum schedule of fees for medical services established in the statute. Ala.Code 1975, § 25-5-77. G.A. West does not challenge the medical expenses for which it was found responsible, which totaled $236, on the basis that those expenses exceeded the prevailing rate or that those expenses exceeded the maximum schedule of fees for medical services. Thus, we reject G.A. West’s argument regarding the lack of evidence of the reasonableness of Johnston’s medical expenses.
As noted above, the trial court erred when it awarded Johnston compensation for the remainder of Johnston’s life instead of for the period of his permanent total disability, and we must reverse the judgment insofar as it contains that language; we remand the cause for the trial court to correct the language in its judgment to comply with § 25-5-57(a)(4). See Hudson, 924 So.2d at 736-37; Adderhold, 852 So.2d at 796. However, we have rejected all other arguments presented by G.A. West. Accordingly, all other aspects of the trial court’s judgment awarding Johnston workers’ compensation benefits for permanent and total disability and ordering G.A. West to pay certain medical expenses are affirmed.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED WITH INSTRUCTIONS.
PITTMAN, J., concurs.
BRYAN, J., concurs in the result, without writing.
MOORE, J., dissents, with writing, which THOMPSON, P.J., joins.

. The original judgment in this case was entered in December 2010. G.A. West appealed that judgment. However, before the appeal was submitted for decision, this court released its opinion in Fort James Holding Co. v. Morgan, 54 So.3d 897 (Ala.Civ.App.2010), in which we held that the failure of a trial court to reduce past medical expenses owed by the employer to a specific amount rendered a workers’ compensation judgment nonfinal. Because the trial court’s original judgment did not specify the amount of past-due medical expenses it had ordered G.A. West to pay, the parties dismissed the appeal by joint stipulation and requested that the trial court correct its judgment to comply with Morgan. The trial court entered its corrected judgment in June 2011, and G.A. West appealed a second time.

. The dissent concludes that the trial court’s judgment should be reversed under Ala.Code 1975, § 25-5-88, because the judgment does not expressly reject the misrepresentation defense asserted by G.A. West. However, we have determined that the lack of a specific mention of the misrepresentation defense to be meager or omissive and not reversible error under § 25-5-88. See, e.g., Werner Co. v. Williams, 871 So.2d 845, 853 (Ala.Civ.App. 2003) ("To the extent some of the findings of the trial court may be meager or omissive, we *81 note that a reversal is not required. Instead, we merely conduct the same review as we would of more specific factual findings to determine whether the ultimate finding made by the trial court is supported by substantial evidence.”); and McCutcheon v. Champion Int'l Corp., 623 So.2d 742, 743 (Ala.Civ.App.1993) (“If the trial court’s findings are meager or omissive, this court may look to the record to determine if the trial court’s judgment should be upheld.”). Based on some of the specific findings found in the judgment, including the findings in paragraph 8, which, although not directly addressing misrepresentation, indicate that the trial court concluded that Johnston’s other injuries (the hip replacements and the coccyx injury) were not back injuries and that the 2006 back injury was a separate injury, not related to those earlier injuries, and based on the trial court's reference to the 2005 and the 2006 injuries as "completely different” in paragraph 9, the trial court's ultimate conclusion that Johnston was permanently and totally disabled indicates that the trial court rejected the misrepresentation defense advanced by G.A. West because the trial court found no causal connection between any previously existing injuries or ailments and the ruptured disk Johnston suffered in September 2006.

. G.A. West mentions in its argument that the trial court "made no finding whatsoever regarding the feasibility of retraining.” If G.A. West is arguing that the failure of the trial court to make a specific finding on this issue is error, it is incorrect. Mead Paper Co. v. Brizendine, 575 So.2d 571, 575 (Ala.Civ.App. 1990) ("However, the trial court is not required to make a specific finding that the worker cannot be retrained for gainful employment. Such a finding is implicit when the trial court concludes that the employee is totally, permanently disabled.”).

. As further support for the conclusion that foreman and supervisors are not exempted from heavy labor, Johnston’s employment application for a position with Performance Contractors, Inc., contained in the record states that all workers applying for any position with that employer must be able to, among other things, "walk or stand for long periods,” "lift and carry 50-75 pounds and 75 or more pounds with assistance,” "climb up and down ladders, scaffolds, etc., while carrying tools and equipment,” and "stoop, kneel, and crouch.”